Henry W. Goddard, Plaintiff in Error, *v*. The President and Trustees of the Town of Jacksonville; and The same *v*. The same.

#### ERROR TO MORGAN.

An ordinance which declares the selling of spirituous liquors a nuisance, and imposes a fine for the offence, is valid, if the corporate powers conferred upon the town are broad enough to authorize the ordinance.

This cause was heard before Woodson, Judge, at October term, 1853, of the Morgan Circuit Court.

S. T. Logan, for plaintiff in error.

M. McConnel and H. B. McClure, for defendants in error.

Scates, J. Goddard was convicted upon two cases for sell-

Goddard *v.* The Town of Jacksonville.

ing liquors in the town of Jacksonville, contrary to an ordinance declaring such sale a nuisance; and a fine of $20 was imposed in each case. The validity of that ordinance is the question presented for our consideration. We are of opinion that the ord' . . e is valid and the conviction right.

A general law under which towns were enabled to incorporate was passed in 1831, and by the 5th section, they were empowered to " establish and execute such ordinances in writing, not inconsistent with the laws, or the constitution of this State, as they shall deem necessary to prevent and remove nuisances." Gale, Stat. 382. In 1835, Gale, Stat. 384, sec. 1, they were further empowered, " to declare what shall be considered a nuisance within the limits of the corporation, and to provide for the abatement and removal thereof." There were many other, and important police powers conferred by these acts, and all their provisions, with additions, were reënacted in 1845. R. S. 114. Among the powers, is one " to provide that such punishments may be inflicted for any offence against the laws of the corporation, as is or may be provided by law for like offences against the laws of the State." By a special ch... r for the town of Jacksonville, Acts 1849, p. 126, the same with additional police powers were conferred, and among others, the power " to license, tax, and regulate auctioneers, groceries, ordinaries, and all places where spirituous or fermented liquors are sold by less quantity than one quart, and the venders of the same; " to regulate the fixing of chimneys and flues, and the manner of using stoves and stove pipes, the storage of gunpowder and other combustible materials ; to prevent the introduction of contagious diseases, to secure the general health, and to make quarantine regulations; to restrain and punish cruelty in the usage and treatment of animals, — and many other disorders, indecencies, and obscenities; and also to restrain, prohibit, and suppress billiard tables, ball alleys, tippling-houses, dram shops, gaming, bawdy, and other disorderly houses.

The objection taken is, a want of power in the corporation to declare and punish the act of selling liquors, as a nuisance; that they are property, and our right of acquiring, holding, using, and disposing of them, is both a natural and constitutional right, and it cannot be invaded, by declaring it to be an offence; the right may be regulated, but not destroyed. Is this doctrine sound and tenable as a universal principle? I think not; and will offer some considerations to show, that while it is true as a general principle, it is not universal, as applicable to all our personal rights, nor to all kinds of property; either in

the acquisition, possession, use, or sale; whether applied to our natural rights, or our constitutional rights. I admit in its fullest sense, the sacredness of our rights, to life, liberty, and property; of pursuing our happiness; to security in our persons, houses, papers, and possessions, from unreasonable searches and seizures; from *ex post facto* laws, or laws impairing the obligations of our contracts; to protection against the taking and applying our property to the public use, without just compensation; and that we ought, for violations of the above rights, and for all injuries and wrongs, to find a certain remedy in the laws. Still, while I admit all these, the question is open as to what are our rights, in a constitutional, political, social, and a natural sense. Some of our natural rights, we must and do surrender or modify, in entering into the social state, and in like manner, a part of both our natural and social rights in entering into the political state. The surrender and modification of these, are such as become indispensable to the good government, the due regulation, and well-being of society, and so paramount to the individual good; and are comprehended under the police powers of government, so far as criminal justice is administered. The framers of Magna Charta, and of the constitutions of the United States, and of the State, never intended to modify, abridge, or destroy the police powers of government. They only prohibited their exercise by *ex post facto* laws, and regulated the mode of trial for offences. This view is sustained by the uniform legislation in England, and in the several States, since the adoption of these fundamental rules, when legislating on these powers. I am not answered, in this view, by the assertion, that it would sustain the government in an invasion of our personal rights, liberty, and property, in doing acts innocent and harmless in their character, and in the acquisition, use, and disposition of property alike harmless, by declaring them unlawful, injurious, and public nuisances to the community. The kinds and character of such acts, acquisitions, uses, and dispositions, both of individuals and property, have been too long known in and too well settled by their effects upon the rights of others, and upon the community, to admit of an arbitrary invasion of private right. The act, and the thing with its use, must be judged and characterized by its effects; and when these bring it within the reason and mischiefs of the law, though it be of a new class of acts, or things, or uses, it must fall under the powers of government to regulate or suppress, as the public good may require the one or the other; and of these the lawgiver must judge. As civilization advanced, and wealth increased, many new arts, inventions,

and trades were introduced, and habits and vices contracted, which, being within the mischiefs, required regulation or suppression, by the application of the principles of the common law, or known usages of society, or the enactment of a new statute, to add to, and embrace them in, the catalogue of crimes and misdemeanors. Yet without the regulation or prohibition, the act, art, invention, trade, or thing, might and would be innocent as a mere matter of private right. But when this private right becomes injurious, noxious, or offensive to the public good, community have a right to protection from it; and the private becomes subordinate to the public right. The right to our own gold and silver, and disposal of it, as the owner might choose, would surely, upon the same argument, include the right to put it into the shape of coin; and this either pure or alloyed; and also to make, or purchase, have, keep, and use, all the necessary apparatus for that purpose. We have a natural right to labor or to rest; yet we are forbidden to become idlers, vagrants, or vagabonds. We have a right to kill and destroy our animals; yet cruelty to them is forbidden. We have a right to give away our property or to destroy it; yet we may not gamble it off. So in relation to storing powder in cities, or exhibiting fireworks; the acts are innocent, but their dangerous tendency to the community, in the particular place, requires the right of the owner to become subordinate to the public good, and to be only exercised in that manner. By the argument, the prime objects and policy of government are overturned in this particular instance, and these are the prevention of crime and injury. We may punish the effect, but we cannot remove or suppress the cause. We may punish cruelty to the beast, but we cannot remove the cause of cruelty to our families. We punish the incendiary of our dwellings; but cannot reach the incendiary of our morbid appetites. We punish with death, one who lays poison in wait, through malice; but he, who openly sells it to us for gain, is beyond our reach. We should blush for Christian morality and civilization, when we confess, either the want of power or inclination, to follow the noble and humane example of the Chinese government, in its attempt to suppress a similar evil in the opium trade. The error is in supposing the right claimed, not to be within the regulation of the police power.

Blackstone enumerates within the police regulations of government, the plague; the sale of unwholesome poisons; idle soldiers and mariners, wandering about the realm, or pretending to be so; gypsies; " all those kinds of nuisances (such as offensive trades and manufactures), which, when injurious to a

private man, are actionable, are, when detrimental to the public, punishable by public prosecution;" "and particularly the keeping of hogs in any city or market town, is indictable as a public nuisance." "All disorderly inns or ale-houses, bawdy houses, gaming-houses, stage-plays, unlicensed booths, and stages for rope-dancers, mountebanks, and the like, are public nuisances." "Inns in particular, being intended for the lodging and receipt of travellers, may be indicted, suppressed, and the innkeepers fined, if they refuse to entertain a traveller without a very sufficient cause; for thus to frustrate the end of their institution, is held to be disorderly behavior." All lotteries; the making and selling of fire-works and squibs, or throwing them about in the street; the making, keeping, or carriage of too large a quantity of gunpowder at one time, or in one place or vehicle; eaves-droppers, common scolds, idlers, disorderly persons, rogues and vagabonds, and gaming. 4 Black. Com. 161 to 171.

I have enumerated these subjects, within the regulation of the police power, at the common law, and by English statutes, and those embraced in the powers of the town charter, that it might be seen that the latter were not as extensive as the police power. The objection urged against this ordinance, that it is an invasion and infringement of private rights, and private property, is fully answered by the maxim, applicable in this class of police powers, *sic utere tuo, ut aliena non lædas,* as also in affording private redress.

The court in New York, in Stuyvesant v. The Mayor, &c., has well remarked upon the principle; they say "it was conceded on the argument, that the corporation have, in general, power so to order the use of private property in the city, as to prevent its proving pernicious to the citizens generally." A contrary doctrine would strike at the root of all police regulations. But a distinction was attempted, between the interests in question in these cases, and property owned absolutely by an individual, which, when one use is forbidden, can be turned to account in another way. In this case it was said the property was confined in the grant to the purposes of interment, and if this particular use be prohibited by the law, it works a total destruction of the right, and fails in the character of a mere regulation.

Such is undoubtedly the consequence, so long as the by-law continues in force. The absolute ownership must reside somewhere; and it should not be in the power of the owner so to cut up and subdivide the uses of his property, as to evade the solitary application of police powers. A lot is granted as a

Goddard *v.* The Town of Jacksonville.

place of deposit for gunpowder, or other purpose, innocent in itself, at the time; it is devoted to that purpose, till, in the progress of population, it becomes dangerous to the property, the safety, or the lives of hundreds; it cannot be that the mere form of the grant, because the parties choose to make it particular, instead of general and absolute, should prevent the use to which it is limited, being regarded and treated as a nuisance, when it becomes so in fact. In this way the legislative powers, essential to the comfort and preservation of populous communities, might be frittered away into perfect insignificance. To allow rights thus to be parcelled out, and secured beyond control, would fix a principle by which our cities and villages might be broken up. Nuisances might, and undoubtedly would be, multiplied to an intolerable extent. Nor can it make any difference that the right is purchased previous to the passage of the by-law, or before it becomes necessary. These laws are usually enacted with a view to evils already existing. Till the state of things is such as to render the act complained of a nuisance upon actual experiment, no law is passed. Every right, from an absolute ownership in property, down to a mere easement, is purchased and holden subject to the restriction, that it shall be so exercised as not to injure others. Though at the time it be remote and inoffensive, the purchaser is bound to know, at his peril, that it may become otherwise, by the residence of many people in the vicinity; and that it must yield to by-laws, or other regular remedies, for the suppression of nuisances. We are of opinion that this by-law is not void, either as being unconstitutional, or as conflicting with what we acknowledge as a fundamental principle of civilized society, that private property shall not be taken even for public use, without just compensation. No property has, in this instance, been entered upon or taken. None are benefited by the destruction or rather the suspension of the rights in question, in any other way than citizens always are when one of their number is forbidden to continue a nuisance. For the same reason there is nothing impairing the obligation of contracts, within the sense of the constitution of the United States." "Nor can the length of time during which property has been used for a particular purpose, make any difference." 7 Cond. R. 604, 605, 606.

I have cited more at length from the argument of the court in this opinion, because it seems to me entirely applicable to the case at bar. In that case Trinity Church, New York, had taken a grant of land for a cemetery, and had enjoyed it for that purpose for more than 100 years; yet its continuance for

such purposes having been declared a nuisance, private right had to yield to the public good, even though the property might not be used for any other.

It is not sufficient to say, that liquors are property, and their sale is as much secured as that of any other property. Their sale for use as a common beverage and tippling, is hurtful and injurious to the public morals, good order and well-being of society. Playing cards, and other gaming instruments, and obscene books, prints, and pictures, are likewise property; and the same right of sale might as justly be claimed; yet no complaint is made that even the importation as well as the sale is forbidden. When we defend the sale of liquors, for the purpose of tippling, we surely draw our arguments from our appetites, and not our reason, observation, and experience. We may carefully protect the public morals, and the profligate, from the evils of gaming, horse-racing, cock-fighting; from obscenity of prints and pictures; from horses and exhibitions of mountebanks and rope-dancers; from the offensive smells of useful trades, and hog-pens; from the manufacture and exhibition of fire-works and squibs; from rogues, idlers, vagabonds, and vagrants; and from the dangers of pestilence, contagion, and gunpowder, — yet, according to the doctrine contended for, this right to vend a slow and sure poison, as a common beverage, must remain intact, and not amenable to police regulations for its suppression, although all the other evils together, will not destroy a tithe of the number of human lives, nor produce more moral degradation, or suffering, wretchedness, and misery in the social relations of society; or pauperism, vagrancy, and crime in the political community, or pecuniary destitution of individuals and families, than will this constitutionally protected right of destroying our neighbors and fellows, for the selfish end of our own individual, private gain. I am utterly incapable of so regarding it, as above all the claims and interests of society; the peace and welfare of families, and especially above the police powers of government; and shall never be brought to acknowledge the sacredness and inviolability of its rights, until I shall be able to forget all that I have seen, observed, known, and experienced of its destructiveness of all that is estimable upon earth. Viewing the great and irreparable mischiefs growing out of this practice, I am not prepared to say that another nuisance may not be added to the list; and that under the police powers, society may find protection from its blighting curse.

These corporate powers, when exercised for the purposes of revenue, or other objects beside the legislative intent in making

the grant, have been held to be void, and examples of this kind are found in the authorities cited by the plaintiff in this case and others, as in 1 Cush. R. 493; 5 Conn. R. 391; 18 Ohio R. 525; 2 Cush. R. 575; 4 Mo. R. 242; 2 Ark. R. 300, 312; 5 Cow. R. 464.

But no case is shown, holding an ordinance void, which was made to carry into effect a necessary and salutary regulation, or a provision for the suppression and abatement of a nuisance.

A former ordinance of the town of Jacksonville, against selling liquor without license, was sustained by this court, in the case of King et al. *v.* President and Trustees of Jacksonville, 2 Scam. R. 305, although there was a State law requiring a license from the county court in force at the same time.

*Judgments affirmed.*

TREAT, C. J., dissented.