# In the Iowa Supreme Court

No. 24–0885

Submitted March 24, 2026—Filed June 26, 2026

**Leonard Gregory, Dee J. Radeke, Sean O'Geary, Jerry Newell, John Hrbek, Chad Welsh, Clarence Fenton, Jack Hays,** and **Joseph Lawrence,**

Appellants,

vs.

**State of Iowa, Iowa State Legislature,** and **Iowa Department of Corrections,**

Appellees.

Appeal from the Iowa District Court for Polk County, Lawrence P. McLellan (motions) and Jeffrey Farrell (trial), judges.

Incarcerated individuals appeal the denial of their constitutional challenges to Iowa Department of Corrections regulations implementing Iowa Code section 904.310A following a bench trial. **Affirmed.**

Oxley, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman, Mansfield, and McDermott, JJ., joined. McDonald, J., filed an opinion concurring in the judgment. May, J., filed an opinion concurring in the judgment.

Theodore T. Appel (argued) of Bradley & Riley PC, Cedar Rapids, and Brent Appel, Ackworth, for appellants Leonard Gregory, Dee J. Radeke, Sean O'Geary, Jerry Newell, John Hrbek, Chad Welsh, Clarence Fenton, and Joseph Lawrence.

Jack Hays, Newton, pro se appellant.

Brenna Bird, Attorney General, Eric Wessan (argued), Solicitor General, Patrick C. Valencia, Deputy Solicitor General, and Breanne A. Stoltze, Assistant

Solicitor General, for appellees State of Iowa and Iowa Department of Corrections.

W. Charles Smithson, Des Moines, for appellee Iowa State Legislature.

Peter E. Larsen of Larsen Law Firm, PLLC, Waterloo, Leah Patton of Patton Legal Services, LLC, Ames, and Rita Bettis Austen of ACLU of Iowa, Des Moines, for amicus curiae American Civil Liberties Union of Iowa.

**Oxley, Justice.**

This case centers on the legal standard for analyzing burdens on incarcerated individuals' free speech rights. Imprisonment does not strip a person of all constitutional rights, but the realities of incarceration require that "the Constitution sometimes permit[] greater restriction of such rights in a prison than it would allow elsewhere." *Beard v. Banks*, 548 U.S. 521, 528 (2006); *accord Risdal v. State*, 573 N.W.2d 261, 263 (Iowa 1998). We must decide whether or how much inmates' right to free speech is circumscribed in the prison context.

Several inmates challenge Iowa Code section 904.310A (2019) because it bans the Iowa Department of Corrections (DOC) from using any funds "to distribute or make available any commercially published information or material to an inmate when such information or material is sexually explicit or features nudity." Iowa Code § 904.310A(1). After more than five years of litigation and a four-day bench trial, the district court applied *Turner v. Safley*, 482 U.S. 78 (1987), and held that the inmates' rights were not violated under the First Amendment or article I, section 7 of the Iowa Constitution. As explained below, we affirm the district court because the State has shown that the challenged regulation is reasonably related to the legitimate penological interest in protecting the safety of prison staff and inmates. *See Turner*, 482 U.S. at 89–91.

## I. Factual Background and Proceedings.

Twelve individuals incarcerated in institutions around the State of Iowa challenged the constitutionality of Iowa Code section 904.310A shortly after the statute was amended in 2018. The new statute imposes stricter prohibitions than its predecessor on the materials of a sexual nature that inmates can access.

**A. Statutory Framework.** Before the amendment, the Iowa Code established reading rooms in Iowa's correctional facilities. *See* Iowa Code

§ 904.310A (2018) (titled "Institution reading rooms"). The prior statute had been in effect for several decades. *See* 1990 Iowa Acts ch. 1251, § 29 (codified at Iowa Code § 246.310A (1991)). It provided the following:

> The director shall, as necessary, provide suitable space for reading material for inmates. For purposes of this section, "*reading material*" does not include material depicting or describing the genitals, sex acts, masturbation, excretory functions, or sadomasochistic abuse which the average person, taking the material as a whole and applying contemporary community standards with respect to what is suitable material for inmates, would find appeals to the prurient interest and is patently offensive; and the material, taken as a whole, lacks serious literary, scientific, political, or artistic value. The space shall be located so that any visitors, other than those authorized pursuant to section 904.512, shall not be able to view the space or the materials located within that space.

Iowa Code § 904.310A. Under that scheme, Iowa's inmates were also allowed to possess some types of sexually explicit or nude material in their cells. *See Dawson v. Scurr*, 986 F.2d 257, 258–59 (8th Cir. 1993) (describing prison access to sexually explicit material under revisions to Iowa Administrative Code rule 291—20.6 after a federal district court held prior restrictions against possessing certain materials in prison cells violated the First Amendment).

The revised statute that the inmates now challenge provides:

> Funds appropriated to the department or other funds made available to the [Department of Corrections (DOC)] shall not be used to distribute or make available any commercially published information or material to an inmate when such information or material is sexually explicit or features nudity.

Iowa Code § 904.310A(1) (2019). The amended statute is substantially similar to a 1997 federal law known as the Ensign Amendment: "[N]o funds [available to the Attorney General for the Federal Prison System] may be used to distribute or make available to a prisoner any commercially published information or material

that is sexually explicit or features nudity." 28 U.S.C. § 530C(b)(6) (flush language).

With the amendment, the general assembly tasked the DOC with "adopt[ing] rules pursuant to chapter 17A to administer" the amended statute. Iowa Code § 904.310A(2). The DOC modified its "Publications" regulation, which provides: "The institution shall allow incarcerated individuals access to publications when doing so is consistent with institutional goals of maintaining internal order, safety, security, and rehabilitation." Iowa Admin. Code r. 201—20.6(1) (2019). "Publications may be purchased by a third party or an incarcerated individual and shall be unused and sent directly from an approved publisher or bookstore which does mail order business." Iowa Admin. Code r. 201—20.6(2) (2022).[1] The DOC is required to maintain a list of approved publications. Iowa Admin. Code r. 201—20.6(4)(*d*) (2019). The regulations require that a "publication review committee" review any publications not on the list, *id.* r. 201—20.6(3), and provide procedures to be followed when an unapproved publication is submitted for review to the committee, *id.* r. 201—20.6(4).

"A publication may be denied when the publication presents a danger to the security or order of an institution or is inconsistent with rehabilitation goals." *Id.* r. 201—20.6(5). One of the "[a]uthorized reasons for denying a publication" is that it "[c]ontains lewd exhibition of the genitals or material which is sexually explicit or features nudity." *Id.* r. 201—20.6(5)(*c*). The DOC defines "sexually explicit" and "nudity" for purposes of the regulations. " '*Sexually explicit*' means a pictorial depiction of actual or simulated sexual acts including sexual

---

[1]The regulation defines *publication* to "include any periodical, newspaper, book, pamphlet, magazine, newsletter, or similar material published by any individual, organization, company, or corporation, and made available for a commercial purpose." Iowa Admin. Code r. 201—20.6(2) (2022).

intercourse, oral sex, or masturbation." *Id.* r. 201—20.2. However, that term "does not include material of a news or information type," nor does it include material "concerning research or opinions on sexual, health, or reproductive issues . . . unless the publications are otherwise a threat to legitimate institutional interests." *Id.* " '*Nudity*' means a pictorial depiction where genitalia or female breasts are exposed. When the pictorial depiction of the female breast displays the areola or nipple, this material will be rejected." *Id.*

The DOC also amended its internal policies related to incoming publications, which are incorporated into the regulations. *See* Iowa Admin. Code r. 201—20.6(1) ("Publications are additionally governed by the provisions of department of corrections policy OP-MTV-02."). DOC policy related to inmates' personal photographs, as opposed to incoming commercial publications, is not at issue in this case. The ultimate issue on appeal is the inmates' complaint that the DOC refuses to distribute or make available any publications containing materials featuring nudity pursuant to section 904.310A that are purchased by an inmate using their own funds or by a third party.

When an inmate requests a publication, the request is reviewed by officials at the inmate's institution. If the publication might violate DOC policy, the publication "shall be sent to the Publication Review Committee," which consists of three members. The committee determines if the publication complies with DOC policy and then issues a "Decision Memo" to ensure uniformity across institutions. Inmates can appeal the denial of a requested publication.

At the time this lawsuit was initiated, the policy prohibited inmates from receiving publications that "compromise the security of the institution." It also specifically provided: "Pursuant to Iowa Code 904.310A . . . lewd exhibition of genitals or other sexually explicit materials will be denied." The policy was

updated in 2022 and now provides: "Pursuant to Iowa Code 904.310A, any pictorial depiction where male or female genitalia are exposed, including female breasts that display the areola or nipple, . . . or other sexually explicit or nude materials will be denied."

**B. Plaintiffs' Lawsuit.** The plaintiffs filed their petition in September 2018, alleging that section 904.310A violated several of their constitutional rights under both the United States and Iowa Constitutions. Eight incarcerated individuals are represented by counsel in this appeal: Leonard Gregory, Dee J. Radeke, Sean O'Geary, Jerry Newell, John Hrbek, Chad Welsh, Clarence Fenton, and Joseph Lawrence. They are inmates at the Anamosa State Penitentiary. Jack Hays, an inmate at the Newton Correctional Facility, proceeds pro se. Plaintiffs represented themselves—quite ably—throughout the lengthy district court proceedings.

In April 2019, the district court granted the plaintiffs' request for a temporary injunction in part because it was concerned that the breadth of the statute implicated the inmates' First Amendment rights. While it denied injunctive relief as to the State's ban of sexually explicit content, the court ordered that the State "shall not prevent the distribution of materials to the [p]laintiffs and other inmates similarly situated that features mere, non-sexually explicit, nudity."

Nearly two years later in March 2021, the district court ruled on the parties' competing motions for summary judgment. It denied the plaintiffs' motion in its entirety. But it granted the State's motion in part, dismissing the plaintiffs' claims that section 904.310A violated their constitutional rights under theories of procedural due process, cruel and unusual punishment, ex post facto laws, and the unenumerated rights clause.

The plaintiffs' claims that section 904.310A violated their rights of freedom of speech, equal protection, substantive due process, and protection from unreasonable search and seizure survived summary judgment. The court applied the test articulated by the United States Supreme Court to free speech challenges to prison regulations in *Turner*, which requires the regulation to be "reasonably related to legitimate penological interests." 482 U.S. at 89–91. Noting there was a split among courts about the type of evidence the government needed to present, the district court agreed with those courts that "require a connection through scientific studies or testimony showing a connection between the regulation and the stated governmental interest." It rejected the approach of courts "willing to find a rational connection through common sense, non-expert testimony of prison officials, or by relying on other cases that have held restrictions on inmates' access to sexually explicit or nude materials have a rational connection to security and rehabilitation." Thus, the court required the government to "provide some evidence" and consequently rejected the State's affidavits containing only "conclusory statements but no record evidence of a connection between the governmental interest and the ban."

Still, the district court imposed parameters on the remaining claims. It held that the plaintiffs only challenged section 904.310A's ban on nudity and that they waived their challenge to the statute's ban on sexually explicit content. The district court also held that the challenges were limited to only printed materials because the plaintiffs failed to separately challenge the State's limitation of television shows and movies that could be viewed. One inmate, Jack Hays, filed a motion to reconsider this limitation shortly before the court's order was appealed. The appeal stayed the district court proceedings, so the district court never ruled on Hays's motion for reconsideration regarding whether the

inmates adequately pleaded that the State unconstitutionally banned television shows and movies pursuant to section 904.310A.

The State sought an interlocutory appeal of the district court's summary judgment ruling. We granted its request and scheduled briefing, prompting the district court to enter a stay in the proceedings at the district court. The State, however, voluntarily dismissed its interlocutory appeal. We issued procedendo in August 2022 and returned the case to the district court.

**C. Bench Trial.** The district court set trial for February 19, 2024, and it held a four-day bench trial. The inmates proceeded pro se and testified in the narrative about why Iowa Code section 904.310A's ban on material that features nudity violated their constitutional rights. They argued the statute banned part of the "entire human culture" that denied their ability to get "an idea what this is about, what life is about, what we're supposed to be doing as human beings." Several inmates testified they had never seen issues regarding inmate or staff safety when an inmate possessed content that featured nudity under the prior regulations.

The plaintiffs claimed that the scope of the materials being banned was broad, including content for an art class at Grinnell College that depicted pictures of sculptures and paintings. They also argued that Prison Rape Elimination Act reports since 2018 showed a lack of sexual violence among inmates; that the statute regulated more than the State's interest in rehabilitation of sex offenders because it applied throughout the state rather than just in the Newton Correctional Facility where the sex offender treatment program (SOTP) is located; that the banned materials were necessary for them to meet their sexual needs, which should be preferred over "grabbing a female staff member"; and that other regulatory options to meet the State's interest were

possible, such as the prior scheme in the Iowa Code allowing the use of reading rooms.

Both parties testified about an Iowa Court of Appeals case, *Sink v. State*, No. 15–0264, 2016 WL 5930337 (Iowa Ct. App. Oct. 12, 2016), involving a correctional officer's sexual-harassment claim against the DOC based on inmates' access to sexually explicit materials. Plaintiff Hays testified that he was familiar with Sink and that he personally observed some of the events that gave rise to her lawsuit. The facts in *Sink* illustrate the difficulty that prison administrators and correctional officers face in maintaining order in correctional facilities:

> Sink was assigned to the Clinical Care Unit (CCU), in which inmates with mental illness and/or severe behavioral problems were housed. Many of the inmates she supervised were sex offenders. The record makes clear that working in the CCU at ISP is a demanding job. Inmates engage in public masturbation and intercourse. Inmates throw feces, urine, and blood at correctional officers. Correctional officers are exposed to possible assaultive behavior.
>
> . . . .
>
> . . . Sink observed a movie on the common CCU television depicting graphic sexual conduct. Several of the inmates, perhaps incited by the programming, began to make lewd comments directed towards her. Sink turned off the television and reported what had happened to her supervisor. The movie was not shown again. However, other movies Sink found objectionable were subsequently shown. Over the years, Sink would often report questionable content to her supervisor and attempt to bring up the subject at weekly steering committee meetings. She was finally told by the warden it was a "dead issue."

*Id.* at *1. The jury entered a defense verdict for the State, but the court of appeals reversed it on a bad jury instruction and sent it back for a new trial, *id.* at *1, *6, where a different jury awarded Sink $2 million in damages, *Sink v. State*, No. LACL134016, 2018 WL 1461391, at *1 (Iowa Dist. Ct. Mar. 7, 2018).

The inmates claim that the *Sink* litigation drove the State to change section 904.310A in 2018,[2] unconstitutionally punishing "the general population of a prison" based on the acts of "people who are mentally ill and serious sexual offenders . . . reacting to this material in a mental health facility." The State counters that *Sink* shows "[i]t's common sense that pornography in prison is a bad idea and that there's a legitimate penological objective in restricting" those materials. According to the State, "[i]t's so common sense that nothing further needs to be discussed."

The State presented three witnesses at trial: Rebecca Bowker, Nicholas Lamb, and Dr. Anthony Tatman. Bowker was a DOC executive officer and served on the State's publication review committee. She testified that the committee's practices involved applying neutral standards that resulted in inmates being allowed to possess "images of women in bikinis," "women in lingerie," and a "medical journal of nude genitalia" as long as it was not of a child. But she testified that the committee would deny publications with pictures of a woman bending over in a way that would reveal her genital area, even if she was clothed, as being lewd.

Lamb served as deputy director of institutional operations and was a former prison warden in Illinois. He testified that the DOC holds sex offenders in all of its prisons. He also testified that "porn" is traded on a regular basis, and there was no feasible way to prevent non–sex-offenders from trading the materials with sex offenders. He testified that, in his general prison administration experience outside of Iowa, offenders "caught with

---

[2]The district court disagreed that *Sink* was the impetus for the amendments to section 904.310A because the amendment was introduced, passed, and signed into law before *Sink* had been resolved. The court also noted that the floor debates for the bill did not make any references to *Sink*.

pornography . . . have committed sexual assaults or other violent assaults against other offenders fighting over pornography." He also witnessed offenders "harass female staff" by showing them pornography "and make unwanted, unprofessional comments towards those female staff in a sexual manner." The district court found Lamb's testimony less helpful because he defined pornography to exclude nudity that was not sexually explicit. Lamb also admitted that, in his work in Iowa's prisons from 2021 to 2024, he "never had any issue . . . here with the nudity, just the pornography."

Dr. Tatman works as a DOC psychologist who oversees the SOTP for the Fifth Judicial District while sex offenders are on probation, parole, or work release. He does not work with sex offenders while they are incarcerated. But Dr. Tatman is familiar with the DOC's SOTP administered at the Newton institution because his program continues the treatment for DOC sex offenders when they transition from prison to parole.

Dr. Tatman was disclosed as a nonretained expert sixty days before trial, which the State now concedes was at least thirty days late. *See* Iowa R. Civ. P. 1.500(2)(*d*)(1) (requiring disclosure of experts ninety days before trial). The district court allowed him to testify as an expert over objections from the plaintiffs about his qualifications and the untimeliness of his disclosure.

Dr. Tatman testified that allowing the sex offenders in his program or the Newton SOTP to have access to pornography, including nude materials, negatively impacts their rehabilitation because the materials function like an addictive substance that "fuel[s] possible deviant fires" and hinders treatment. He also testified that pornography—which he defined as including both sexually explicit content and nudity—was problematic for the sex offenders that he worked with after they had been released from incarceration. While academic

studies have found a correlation between pornography and aggression, Dr. Tatman admitted on cross-examination that the conclusions were the subject of reasonable academic debate. Dr. Tatman did not identify any studies that specifically analyzed pornography or nude materials impacting prison conditions.

**D. The District Court's Judgment.** The district court issued a thorough thirty-eight-page opinion following the bench trial. It concluded that the regulatory ban did not violate the plaintiffs' rights to free speech, equal protection, or due process, and that the regulation was not void for vagueness or overbreadth.

The district court applied the four-factor test established by *Turner* to the plaintiffs' constitutional free speech claims under both the United States and the Iowa Constitutions. It rejected the plaintiffs' argument that the Iowa Constitution provided greater free speech protections than the First Amendment. The district court recognized that the statute, regulations, and DOC policies now in place "are much more restrictive [than the prior policies] because the reading rooms were closed and sexually explicit materials and materials with nudity (subject to the temporary injunction) are now barred from the prison." Nonetheless, the district court followed the lead of federal courts, the "vast majority" of which had rejected free speech claims by federal inmates challenging similar bans under the Ensign Amendment.

The district court found that Dr. Tatman's testimony did not support the State's argument that the ban was rationally related to the rehabilitation of inmates—with the exception of the Newton prison—because the DOC does not provide rehabilitative sex offender treatment outside of Newton. It nonetheless found that "there may be some ancillary rehabilitation benefits to barring

materials with nudity in prisons, as have been discussed in other court decisions." The court added that "[e]ach prison houses sex offenders, so it is reasonable to believe there may be some rehabilitation benefits even though they are not in a sex offender treatment program at that time." This finding was due, in part, to the fact that the judge who presided over the bench trial took "the countervailing view" to the judge who ruled on the earlier summary judgment. The trial judge took the view "that there is no need for factual proof to support the nexus, in part, because United States Supreme Court precedent requires the courts to accord substantial deference to the informed judgment of prison officials on matters of prison administration."

The district court did find that the record supported the State's justification that "inmate and staff safety may be impacted by allowing materials containing nudity into the inmate population." Recognizing that some studies showed the opposite, the district court nonetheless credited Dr. Tatman's testimony about other studies that suggest a link between materials containing nudity and prison violence because "a rational legislature and DOC could find the studies cited by Dr. Tatman to be more persuasive." The district court also relied on Lamb's testimony about specific instances of inmate assaults or harassment of female staff over pornography. It concluded that Lamb's testimony corroborated Dr. Tatman's testimony, even though Lamb discussed events that occurred at prisons outside of Iowa and his definition of pornography was broader than the nude material at issue here.

After the State satisfied the threshold question of whether there was a rational connection between the regulations and the State's interest, the district court also found that the second, third, and fourth *Turner* factors favored the State: (2) the regulations draw a line only at sexually explicit and nude materials,

so inmates can still receive a broad range of publications; (3) given the proliferation of trading materials among inmates, the DOC would have a difficult time keeping the materials out of the hands of sex offender inmates; and (4) the cost in staff time countermanded plaintiffs' suggested alternatives of more extensive cell searches and discipline. The court therefore denied the plaintiffs' claims for declaratory and injunctive relief.[3]

The district court rejected Hays's challenge to the ban on television shows and movies during trial. It relied on an earlier ruling by the motion judge, which concluded that the definition of commercially published information in Iowa Admin. Code r. 201—20.2 could not extend to television shows and movies.

The plaintiffs appealed, and we retained the case. We sought pro bono representation to handle the appeal, and former Justice Brent Appel and his son, Theodore Appel, answered the call. We express our appreciation for the exemplary representation they provided to their clients. Plaintiff Hays continued to represent himself on appeal, filing a separate brief from the remaining plaintiffs. The represented plaintiffs' appeal challenges only the free speech ruling. Hays's appellate brief largely tracks with the represented parties' appeal, but he also raises additional issues that we address only as to him.

**II. Analysis.**

The primary issue on appeal is determining the proper legal standard for the inmates' challenge to section 904.310A. Before that, however, our analysis begins by explaining why Dr. Tatman's testimony was properly admitted at trial.

---

[3]The district court found the DOC in contempt of its prior injunctive order when it denied plaintiff Welsh's request for three editions of *Playboy* magazine, which had been approved under the DOC's prior policy that was to remain in effect pending the outcome of this case. Although plaintiff Hays made a similar claim of contempt concerning a *Sports Illustrated Swimsuit* issue that was taken from his possession, Hays never offered testimony to support his contempt application, so the district court denied his application for contempt. The contempt findings were not appealed.

We then turn to the central dispute in this case: explaining and applying the proper legal standard for the inmates' free speech constitutional challenges. We must also address Hays's various constitutional arguments that go beyond what was raised by the other inmates who are represented by counsel. Finally, we conclude by clarifying what issues this opinion does not decide.

**A. Admission of Dr. Tatman's Testimony.** The State disclosed Dr. Tatman, a clinical services director and psychologist employed by the DOC, as a nonretained expert witness on December 21, 2023—sixty days before the February 19, 2024 trial. The plaintiffs objected, seeking to strike the designation as untimely and challenging Dr. Tatman's qualifications. The district court agreed that the designation was untimely by at least thirty days, *see* Iowa R. Civ. P. 1.500(2)(*d*)(1), but declined to exclude him from testifying. The district court noted that the State provided considerable information with Dr. Tatman's designation and that the plaintiffs raised "rational arguments regarding Dr. Tatman's qualifications and ability to provide testimony that would be relevant to this case," which they could use to challenge his testimony at trial. The district court ultimately concluded that the plaintiffs were not prejudiced because they "appear prepared for this testimony," and there was no evidence they would have retained a rebuttal expert even though the court offered to allow extra time for them to do so.

It is undisputed that the State was untimely in disclosing Dr. Tatman as an expert witness. The State contends that its disclosure was only thirty days late, relying on the ninety-day deadline required by rule 1.500(2)(*d*)(1). It explains the delay based on its mistaken belief that the rule required disclosure within sixty days of trial, not ninety. The plaintiffs argue that, in fact, the State's disclosure was three years late, relying on a February 2020 trial scheduling order

setting the date to disclose expert opinion reports as October 22, 2020. The February 2020 scheduling order provided the following deadlines for designating expert witnesses:

**7. EXPERT WITNESS.**

a. A party who intends to call an expert witness, including rebuttal expert witnesses, shall certify to the Court and all other parties the expert's name, subject matter of expertise and qualifications, within the following time period, unless the Iowa Code requires an earlier designation date (See, e.g., Iowa Code Section 668.11). **The expert witness's report of opinions is due on the date of designation.**

b. :

1) Plaintiff: <u>September 22, 2020.</u>

2) Defendant/Third-Party Plaintiff: <u>October 22, 2020.</u>

3) Third-Party Defendant/Other/Rebuttal: <u>November 22, 2020.</u>

c. This section does not apply to Court-appointed experts.

The State counters that the scheduling order applied only to retained experts, who are required to issue a report. Nonretained experts are not required to issue reports, *see* Iowa R. Civ. P. 1.500(2)(*b*), so the State claims that the standard ninety-day deadline in rule 1.500(2)(*d*)(1) applies to Dr. Tatman instead.

The district court agreed with the State and applied the ninety-day deadline under rule 1.500(2)(*d*)(1). It reasoned that the October 2020 deadline "only refers to experts who will be relying on a report of opinions," which did not include a nonretained expert like Dr. Tatman.

We review the interpretation of rules of civil procedure like rule 1.500 for correction of errors at law. *McGrew v. Otoadese*, 969 N.W.2d 311, 319 (Iowa 2022). And "[w]e review whether a district court properly admitted expert

testimony for abuse of discretion." *Id.* (quoting *Eisenhauer ex rel. T.D. v. Henry Cnty. Health Ctr.*, 935 N.W.2d 1, 9 (Iowa 2019)).

First, we agree with the district court that rule 1.500(2)(*d*)(1) applies, so the State's disclosure of Dr. Tatman was only thirty days late. But we agree for a different reason. The October 2020 deadline that the plaintiffs rely on was set in a scheduling order entered before the district court proceedings were stayed by our grant of the State's interlocutory appeal. We later remanded the case once the appeal was voluntarily dismissed. "Usually, we assume that new deadlines will be established following remand." *Kirlin v. Monaster*, 19 N.W.3d 108, 116 (Iowa 2025). That assumption applies here. A comment to rule 1.500(2)(*d*) recognizes that "many, if not most, cases [involving the timeliness of disclosing expert testimony] . . . will be governed by a trial scheduling order." Iowa R. Civ. P. 1.500(2)(*d*) comment. But this is not one of those cases. Because the case was remanded and no new scheduling order was issued, the default rule governing the deadline to disclose expert testimony under rule 1.500(2)(*d*) applies rather than the scheduling order issued before remand.

Next, in considering whether the district court abused its discretion in allowing the State to present its untimely expert, we examine four factors: "(1) the party's reasons for not providing the challenged evidence during discovery; (2) the importance of the evidence; (3) the time needed for the other side to prepare to meet the evidence; and (4) the propriety of granting a continuance." *Lawson v. Kurtzhals*, 792 N.W.2d 251, 259 (Iowa 2010) (quoting 27 C.J.S. Discovery § 102, at 169 (2009)).

The first two factors cut in favor of the challengers' argument for exclusion. The district court correctly identified that the State had no good reason for the late designation. The State simply erred in believing that the rule 1.500(2)(*d*)

deadline was sixty rather than ninety days before trial. And Dr. Tatman's expert testimony was important; he was just one of three witnesses in the case, and he testified "that studies support a link between materials containing nudity and violence in prisons," which is a crucial fact under the *Turner* factors that the district court analyzed.

The third and fourth factors, however, favor the State. The challengers did not need additional time to prepare for expert testimony because they were notified about the possibility of such testimony (although from a differently identified witness) as early as 2019. They were also reminded of the State's possible expert testimony in the court's summary judgment ruling. The State provided ample information about Dr. Tatman along with its disclosure, and the court offered to "leave the record open to allow additional time to admit the testimony of a rebuttal expert" for the challengers, but they did not exercise that option. Lastly, for the fourth factor, a continuance was disfavored to give the challengers more time to prepare because the case had already been pending for five and a half years when the district court ruled on the motion to exclude Dr. Tatman.

In sum, it was not clearly untenable for the court to allow Dr. Tatman to testify. As the district court noted, both the State and the challengers raised "valid points." Although the district court may have been justified had it chosen to exclude Dr. Tatman as a witness, it did not abuse its discretion in deciding not to do so. Our caselaw is "clear that we are committed to a liberal view on the admissibility of expert testimony, and we have been quite deferential to the district court in the exercise of its discretion in that area." *Leaf v. Goodyear Tire & Rubber Co.*, 590 N.W.2d 525, 531 (Iowa 1999) (en banc) (quoting *Mensink v. Am. Grain & Related Indus.*, 564 N.W.2d 376, 380 (Iowa 1997)). "Exclusion [of

an untimely disclosed expert witness] should not be imposed lightly," *Klein v. Chi. Cent. & Pac. R.R.*, 596 N.W.2d 58, 61 (Iowa 1999), because it "is the most severe sanction available under . . . the rule[s] concerning discovery of experts," *Schoenfeld v. FDL Foods, Inc.*, 560 N.W.2d 595, 598 (Iowa 1997). The district court's judgment call not to employ the most severe sanction of exclusion in this case was not an abuse of discretion.

**B. Inmates' Rights Under the United States Constitution.** Plaintiffs assert that Iowa Code section 904.310A and its implementing regulations violate their First Amendment right to receive publications that contain nudity. If the plaintiffs were not incarcerated, the regulations would be subject to strict scrutiny because, on its face, section 904.310A is a content-based regulation. *See Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) ("[T]his Court has long held that laws regulating speech based on its subject matter or 'communicative content' are 'presumptively unconstitutional.' As a general rule, such 'content-based' restrictions trigger 'strict scrutiny,' a demanding standard that requires the government to prove its restriction on speech is 'narrowly tailored to serve compelling state interests.' " (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015))); *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) ("A regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.' " (alteration in original) (quoting *Reed*, 576 U.S. at 163)). The statute imposes an outright ban on "any commercially published information or material . . . when such information or material is sexually explicit or features nudity," Iowa Code § 904.310A(1), without limiting the ban

to a legitimate penological reason, *see Thornburgh v. Abbott*, 490 U.S. 401, 413, 415 (1989).

But the plaintiffs' imprisonment and the statute's implementing regulations change the content-neutrality calculus. The regulations temper section 904.310A's outright ban by requiring the DOC to provide "access to publications when doing so is consistent with institutional goals of maintaining internal order, safety, security, and rehabilitation." Iowa Admin. Code r. 201—20.6(1). The regulations are thus "agnostic as to content" because they do not have "a content-based purpose or justification" where the materials are accessible so long as they are consistent with the institution's legitimate penological interests. *Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. at 69; *see also Bell v. Wolfish*, 441 U.S. 520, 550–51 (1979) (holding that "a prohibition against receipt of hardback books" does not violate inmates' First Amendment rights in part because "[t]he rule operates in a neutral fashion, without regard to the content of the expression"); *Pell v. Procunier*, 417 U.S. 817, 828 (1974) ("So long as this restriction operates in a neutral fashion, without regard to the content of the expression, it falls within the 'appropriate rules and regulations' to which 'prisoners necessarily are subject,' and does not abridge any First Amendment freedoms retained by prison inmates." (quoting *Cruz v. Beto*, 405 U.S. 319, 321 (1972) (per curiam))).

The regulations also provide a review mechanism for inmates to seek access to publications not included on the DOC's list of approved publications. *See* Iowa Admin. Code r. 201—20.6(3). Plaintiffs do not argue that the DOC's practices have gone beyond the regulations to an outright ban under the statute. We therefore limit our discussion to the implementing regulations. *See, e.g.*, *Amatel v. Reno*, 156 F.3d 192, 194–95 (D.C. Cir. 1998) (rejecting the district

court's focus on the Ensign Amendment statute itself and directing scrutiny instead to the Bureau's implementing regulations because "there is no suggestion that any warden does or will apply the statute directly; so far as appears, all enforcement is mediated through the regulations").

Still, "[s]exual expression which is indecent but not obscene is protected by the First Amendment." *Reno v. ACLU*, 521 U.S. 844, 874 (1997) (alteration in original) (quoting *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989)). The First Amendment protects adults' right to access sexually explicit content. *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 466 (2025) (recognizing "all agree" that adults "have a First Amendment right to access at least some" sexually explicit content on pornography websites).

"This right to receive information and ideas, regardless of their social worth, is fundamental to our free society." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (citation omitted). The right to receive information necessarily follows from the First Amendment's freedom of speech:

> This right is an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution, in two senses. First, the right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them: "The right of freedom of speech and press . . . embraces the right to distribute literature, and necessarily protects the right to receive it." *Martin v. Struthers*, 319 U.S. 141, 143 . . . (1943) (citation omitted). "The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers." *Lamont v. Postmaster General*, 381 U.S. 301, 308 . . . (1965) (BRENNAN, J., concurring).
>
> More importantly, the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom. [James] Madison admonished us:
>
> > "A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a

> Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives."
> 9 Writings of James Madison 103 (G. Hunt ed. 1910).

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion) (first omission in original); *accord Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978) ("[Broadcasting companies] have a First Amendment right to receive letters from inmates criticizing jail officials and reporting on conditions.").

"Imprisonment does not strip inmates of all constitutional rights—including free speech rights protected by the first amendment of the United States Constitution." *Risdal*, 573 N.W.2d at 263. Yet, the practicalities of "[l]awful incarceration . . . necessitates a 'withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' " *Id.* (quoting *Pell*, 417 U.S. at 822). How those rights intersect is at the heart of this case.

1. *Inmates' First Amendment free speech rights.* The Supreme Court first addressed "the appropriate standard of review for prison regulations restricting freedom of speech" in *Procunier v. Martinez*, 416 U.S. 396, 406 (1974), *overruled by Thornburgh*, 490 U.S. 401. California inmates brought a class-action challenge to the California DOC's rules censoring the content of incoming and outgoing inmate mail with anyone other than licensed attorneys and public officials. *Id.* at 398–400. Noting that the regulations affected First Amendment rights of both the inmates and the persons with whom they corresponded, *id.* at 408–09, the Supreme Court set out the following two-prong analysis for determining when censorship of inmate mail is justified:

> First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the

suppression of expression. . . . [Prison officials] must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved.

*Id.* at 413.

The Supreme Court revisited its *Martinez* standard in another inmate class-action suit, *Turner v. Safley*, this time challenging a Missouri prison regulation that banned correspondence between inmates in different institutions except between immediate family members or concerning legal matters. 482 U.S. at 81. The Eighth Circuit had characterized *Martinez* as applying a strict scrutiny standard to then conclude that the challenged regulation violated the First Amendment because "it was not the least restrictive means of achieving the security goals of the regulation." *Id.* at 83. "In the [Eighth Circuit's] view, prison officials could meet the problem of inmate conspiracies by exercising their authority to open and read all prisoner mail." *Id.*

In reversing the Eighth Circuit, the Supreme Court reviewed its decision in *Martinez,* noting that it had focused on the rights of the non-inmates who corresponded with an inmate and "expressly reserved the question of the proper standard of review to apply in cases involving questions of *prisoners'* rights." *Id.* at 85–86 (emphasis added) (citation modified). In contrast, the regulation in *Turner* involved only inmate-to-inmate correspondence, raising the "prisoner's rights" question left unanswered by *Martinez. See id.* The Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. The Court explained: "In our view, such a standard is necessary if 'prison administrators . . . , and not the courts, [are] to make the difficult judgments

concerning institutional operations.'" *Id.* (alteration and omission in original) (quoting *Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 128 (1977)). The First Amendment rejects "an inflexible strict scrutiny analysis [that] would seriously hamper [prison officials'] ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Id.*

The Court identified several factors relevant to "determining the reasonableness of the regulation at issue." *Id.* "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)). The Court pointed out that "the governmental objective must be a legitimate and neutral one" and "found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression." *Id.* at 90; *accord Bell*, 441 U.S. at 551; *Pell*, 417 U.S. at 828.

The other relevant factors include "whether there are alternative means of exercising the right that remain open to prison inmates," "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.* at 90. But "[b]y the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* The Court made clear that "[t]his is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* at 90–91. Having identified the standard to be

applied, the Court concluded in *Turner* that "the record clearly demonstrates that the regulation [banning inmate-to-inmate correspondence] was reasonably related to legitimate security interests." *Id.* at 91.

The Court did not overrule *Martinez* in *Turner*. It did that two years later in *Thornburgh v. Abbott. See* 490 U.S. at 413–14. *Thornburgh* involved a class of federal inmates who brought both facial and as-applied challenges to "[r]egulations promulgated by the Federal Bureau of Prisons [that] broadly permit federal prisoners to receive publications from the 'outside,' but authorize prison officials to reject incoming publications found to be detrimental to institutional security." *Id.* at 403. The regulations, which governed federal inmate access to publications prior to the Ensign Amendment, *see Amatel,* 156 F.3d at 193, "generally permit[ted] an inmate to subscribe to, or to receive, a publication without prior approval, but authorize[d] the warden to reject a publication in certain circumstances," *Thornburgh,* 490 U.S. at 404 (footnote omitted) (describing 28 C.F.R. §§ 540.70, .71). The regulations allowed the warden to reject a publication "only if it [was] determined detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity." *Id.* (quoting 28 C.F.R. § 540.71(b)). But the warden could "not reject a publication 'solely because its content [was] religious, philosophical, political, social *or sexual,* or because its content [was] unpopular or repugnant.' " *Id.* at 405 (emphasis added) (quoting 28 C.F.R. § 540.71(b)). In addition, "[t]he warden [was] prohibited from establishing an excluded list of publications: each issue of a subscription publication [was] to be reviewed separately." *Id.* (citing 28 C.F.R. § 540.71(c)). Finally, the regulations provided procedural safeguards for the inmate and the sender of the publication. *Id.* at 406.

The Court defended its opinion in *Martinez*: "We do not believe that *Martinez* should, or need, be read as subjecting the decisions of prison officials to a strict 'least restrictive means' test. As noted, *Martinez* required no more than that a challenged regulation be 'generally necessary' to a legitimate governmental interest." *Id.* at 411–12 (quoting *Martinez,* 416 U.S. at 414). The Court then reaffirmed its holding in *Martinez* that the regulations there involving only outgoing correspondence "swept too broadly," *id.* at 412, but it limited that holding to "regulations concerning outgoing correspondence," *id.* at 413.

It held "that regulations affecting the sending of a 'publication' . . . to a prisoner must be analyzed under the *Turner* reasonableness standard" such that the "regulations are 'valid if [they are] reasonably related to legitimate penological interests.' " *Id.* (alteration in original) (quoting *Turner*, 482 U.S. at 89). Noting it could "apply a reasonableness standard to all incoming materials without overruling *Martinez*" by simply making clear that a "least restrictive alternative" analysis did not apply, the Court "cho[se] not to go that route." *Id.* at 414. Rather, it "prefer[red] the express flexibility of the *Turner* reasonableness standard" and "adopt[ed] the *Turner* standard in this case with confidence that, as petitioners here have asserted, 'a reasonableness standard is not toothless.' " *Id.*

The Court described the first *Turner* factor as "multifold," explaining that "we must determine whether the governmental objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective." *Id.* As to neutrality, the Court noted that the regulations "turn, to some extent, on content" where they "distinguish between rejection of a publication 'solely because its content is religious, philosophical, political, social or sexual, or because its content is unpopular or repugnant' (prohibited) and rejection because the publication is detrimental to security

(permitted)." *Id.* at 415–16 (quoting 28 C.F.R. § 540.71(b) (1988)). The Court went on to explain, however, that its "reference to 'neutrality' in *Turner* was intended to go no further than its requirement in *Martinez* that 'the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression.' " *Id.* (quoting *Martinez*, 416 U.S. at 413). "Where, as here, prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' in the technical sense in which we meant and used that term in *Turner.*" *Id.*; *accord Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. at 69 ("[A]bsent a content-based purpose or justification, the City's distinction is content neutral and does not warrant the application of strict scrutiny.").

Applying this standard, the Court "conclude[d] that the broad discretion accorded prison wardens by the regulations here at issue is rationally related to security interests" for two reasons. *Thornburgh*, 490 U.S. at 416. The first was the security risks posed by incoming publications identified in the record, which included many of the concerns raised in this case about materials being traded among inmates and the associated potential for disruptive conduct or disorder. *Id.* at 412–13, 416. But the second reason has more relevance here. The Court said:

> Second, we are comforted by the individualized nature of the determinations required by the regulation. Under the regulations, no publication may be excluded unless the warden himself makes the determination that it is "detrimental to the security, good order, or discipline of the institution or . . . might facilitate criminal activity." 28 CFR §§ 540.70(b), 540.71(b) (1988). This is the controlling standard. A publication which fits within one of the "criteria" for exclusion may be rejected, but only if it is determined to meet that standard under the conditions prevailing at the institution at the time. Indeed, the regulations expressly reject certain shortcuts that would lead to needless exclusions. *See* § 540.70(b) (nondelegability of power to reject publications);

§ 540.71(c) (prohibition against establishing an excluded list of publications).

*Id.* at 416–17 (omission in original). Still, federal circuit courts have disagreed about the proper way to apply *Turner*.

2. *Circuit split applying* Turner *to the Ensign Amendment.* The Supreme Court decided *Thornburgh* in 1989. As noted, the Iowa statute at issue here mirrors the Ensign Amendment—a federal law that took effect in 1997. *Compare* Iowa Code § 904.310A, *with* 28 U.S.C. § 530C(b)(6). The regulations upheld in *Thornburgh* were replaced by the Ensign Amendment regulations. *See Amatel*, 156 F.3d at 194 (discussing 28 C.F.R. § 540.71 as it existed at the time of *Thornburgh* and its subsequent amendments in light of the Ensign Amendment).

Federal courts that have considered challenges to the Ensign Amendment have rejected the challenges. The courts take different views, however, on how the *Turner* test applies. *Contrast Ramirez v. Pugh*, 379 F.3d 122, 128 (3d Cir. 2004) ("To say . . . that rehabilitation legitimately includes the promotion of 'values,' broadly defined, with no particularized identification of an existing harm towards which the rehabilitative efforts are addressed, would essentially be to acknowledge that prisoners' First Amendment rights are subject to the pleasure of their custodians."), *with Amatel*, 156 F.3d at 198 ("The generality of [*Turner v.*] *Safley*'s reasonableness test, and common sense as well, suggest that the flexibility open to the political branches must be at its apogee in institutions for the care and custody of those who have already transgressed society's norms. If 'promoting respect for authority and traditional values' among schoolchildren is a legitimate interest of government and not inherently a form of speech suppression, surely the same is true of promoting such a goal among criminals." (citation omitted)).

The D.C. Circuit was the first federal appellate court to address the question in a consolidated case arising from separate challenges brought by three inmates who were denied *Playboy* and *Penthouse* magazines, as well as by the publishers of those magazines. *See Amatel*, 156 F.3d at 195. In *Amatel v. Reno*, the D.C. Circuit concluded that the stated goal of rehabilitating inmates was both legitimate and neutral under the first *Turner* factor. *Id.* at 196–98 (describing *Turner* as imposing a "rather thin neutrality requirement"). The D.C. Circuit concluded that *Turner*'s requirement for "a 'valid rational connection' between the interest and the regulations" was essentially a rational basis test that was met based on common sense. *Id.* at 198–99 ("Prison jurisprudence is not well enough developed to indicate precisely how demanding the requirement of rational means-end connection is.").

The *Amatel* dissent disagreed with adopting a rational basis standard. *See id.* at 203–05 (Wald, J., dissenting). The dissent read the *Turner* framework as embracing two principles. *Id.* at 204. "First, fundamental rights of prisoners must give way to governmental concerns more readily than the fundamental rights of nonprisoners." *Id.* Thus, it agreed that strict scrutiny was the wrong standard because it "would place an inordinately high obstacle in the way of prison administrators' attempts to run their institution safely and efficiently." *Id.* at 205. Yet, the dissent noted a second significant principle from *Turner*: "[T]he Court did not intend [*Turner*'s] lesser standard of review to negate prisoners' constitutional rights altogether, as the majority seems to suggest. The Court did not say, for example, that prison regulations are valid if there is any conceivable basis for their existence, as rational basis review is typically formulated." *Id.* So, the dissent concluded that "although the strictness of our review is lessened, it is not eliminated altogether," identifying that the "task, ultimately, is to assess

the fit between the interest proffered and the remedy adopted—whether the regulation under consideration is a reasonable means of addressing the legitimate penological interest put forward by the government." *Id.* at 206.

The Third Circuit subsequently sided with the *Amatel* dissent, holding that a challenge to the Ensign Amendment regulations could not be decided on a motion to dismiss "without any analysis or inquiry into the interests involved and the connection between those interests and the restriction at issue." *Ramirez*, 379 F.3d at 126–29. In *Ramirez v. Pugh*, the court made clear that the specific governmental interest identified to support the regulation must itself provide the rational connection to the restriction on inmates' free speech rights. *Id.* at 128 ("[A]lthough the District Court correctly identified rehabilitation as a legitimate penological interest, it did so without adequately describing the specific rehabilitative goal or goals furthered by the restriction on sexually explicit materials." (citation omitted)).

The Third Circuit's approach recognized that the inmates' fundamental constitutional rights were at stake. *See id.* at 128–29. It disagreed with the *Amatel* majority on two bases. First, where the identified interest was rehabilitation, "[t]o say . . . that rehabilitation legitimately includes the promotion of 'values,' broadly defined, with no particularized identification of an existing harm towards which the rehabilitative efforts are addressed, would essentially be to acknowledge that prisoners' First Amendment rights are subject to the pleasure of their custodians." *Id.* at 128. The Third Circuit sided with the *Amatel* dissent in rejecting this characterization of rehabilitation in the prison setting. "[T]o proceed on some vague assertion of an interest in 'rehabilitation' without the need to define the term or to show a connection between the proscribed activity and the chosen definition . . . runs an overwhelming risk of

overregulation," which is inconsistent with the regulations' infringement of the inmates' fundamental rights. *Id.* at 129–30 (alteration and omission in original) (quoting *Amatel*, 156 F.3d at 210 (Wald, J., dissenting)).

Second, the Third Circuit also disagreed with *Amatel*'s reliance on its own "common sense" without requiring an evidentiary record to establish the required connection. *See id.* at 129. Because the Ensign Amendment is directed at the federal inmate population as a whole, the court could "not find the connection between the Ensign Amendment and the government's rehabilitative interest to remain obvious upon consideration of the entire federal inmate population, including those prisoners not incarcerated for sex-related crimes." *Id.*

The Third Circuit therefore concluded that a factual record was required to make that connection. *Id.*; *see also Wolf v. Ashcroft*, 297 F.3d 305, 309 (3d Cir. 2002) (requiring an evidentiary showing roughly corresponding to the degree to which the required means-end connection is "attenuated"). "Determining whether there is a rational link between sexually explicit material and the harms toward which the government's overall rehabilitative efforts are directed requires more than a conclusory assertion that the 'consumption of [sexually explicit] publications [ ] implicitly elevate[s] the value of the viewer's immediate sexual gratification over the values of respect and consideration for others' and a generalized statement that sexual self-control is relevant to the rehabilitation of the entire class of federal prisoners." *Ramirez*, 379 F.3d at 130 (alterations in original) (quoting *Amatel*, 156 F.3d at 199, but disagreeing with it). The *Ramirez* court also held that an evidentiary record was required to support the other *Turner* factors, given that the court has "historically viewed these inquiries as being fact-intensive . . . [requiring] 'a contextual, record-sensitive analysis.' " *Id.*

(alteration and omission in original) (quoting *Wolf*, 297 F.3d at 310); *see also Waterman v. Farmer*, 183 F.3d 208, 210, 215–16 (3d Cir. 1999) (upholding a New Jersey statute restricting inmate access to pornographic materials at a facility for sex offenders who exhibited "repetitive and compulsive" behavior, identifying the legitimate penological interest as the rehabilitation of the state's "most dangerous and compulsive sex offenders" and finding the required connection between the statutory ban and that interest based on an evidentiary record that included two expert affidavits who attested that sex offenders' exposure to pornography would thwart the prison staff's rehabilitative strategies and treatments).

3. *The* Turner *framework is a reasonableness test, not rational basis review.* We agree with the *Ramirez* court that the *Turner* standard requires evidentiary support in a challenge to the institution-wide restrictions. *See Ramirez*, 379 F.3d at 130. It is not, as *Amatel* presumes, a traditional rational basis test. *See Beard*, 548 U.S. at 535 (requiring more than a mere logical connection); *Thornburgh*, 490 U.S. at 414 (recognizing the standard is "not toothless"). That conclusion is clear from *Thornburgh*, where the Supreme Court chose to overrule *Martinez* rather than just clarify that it was not requiring a least restrictive alternative analysis in favor of the "flexibility" and teeth in *Turner*'s reasonableness standard. *Thornburgh*, 490 U.S. at 413–14; *see also Aiello v. Litscher*, 104 F. Supp. 2d 1068, 1080 (W.D. Wis. 2000) ("Because defendants do not disavow applications of the regulation prohibiting depictions of the Sistine Chapel, I assume defendants thought that rehabilitation would be furthered by banning those depictions as well as depictions of bestiality. If so, they have failed to submit any credible evidence from which a trier of fact could conclude reasonably there is such a connection.").

Rational basis review applies to constitutional rights that are not fundamental rights. *See AFSCME Iowa Council 61 v. State*, 928 N.W.2d 21, 32–33 (Iowa 2019). The right to freedom of speech is a fundamental right. *Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*, 9 N.W.3d 37, 51 (Iowa 2024) ("[F]ree speech . . . [is a] fundamental right[] enumerated in the Federal and State Constitutions."). And it is clear that inmates do not lose all of their constitutional rights just because they are incarcerated. *See Hudson v. Palmer*, 468 U.S. 517, 523 (1984) ("We have repeatedly held that prisons are not beyond the reach of the Constitution. No 'iron curtain' separates one from the other. Indeed, we have insisted that prisoners be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." (quoting *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974))). While "imprisonment carries with it the circumscription or loss of many significant rights," *State v. Fox*, 493 N.W.2d 829, 831 (Iowa 1992) (quoting *Hudson*, 468 U.S. at 524), free speech rights are among the rights that are circumscribed, not the ones that are lost, *see Hudson*, 468 U.S. at 523 ("Prisoners must be provided 'reasonable opportunities' to exercise their religious freedom guaranteed under the First Amendment[, and] they retain those First Amendment rights of speech 'not inconsistent with [their] status as . . . prisoner[s] or with the legitimate penological objectives of the corrections system.' " (second and third alteration and omission in original) (second quoting *Pell*, 417 U.S. at 822)).

The Supreme Court defended its holding in *Martinez* as requiring that regulations "be 'generally necessary' to a legitimate governmental interest," *Thornburgh*, 490 U.S. at 411–12 (quoting *Martinez*, 416 U.S. at 414), which is consistent with its adoption of "the *Turner* reasonableness standard," *id.* at 413.

Under that test, "[s]uch regulations are 'valid if [they are] reasonably related to legitimate penological interests.' " *Id.* (second alteration in original) (quoting *Turner*, 482 U.S. at 89); *accord Reynolds v. Quiros*, 25 F.4th 72, 83 (2d Cir. 2022) (recognizing that *Turner* establishes "the appropriate standard of review [a]s 'reasonableness' " (quoting *Turner*, 482 U.S. at 89)).

This reasonableness test is not, as *Amatel* suggests, a traditional rational basis test. "*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective." *Beard*, 548 U.S. at 535. That is distinct from rational basis review, which "defers to the legislature's prerogative to make policy decisions by requiring only a plausible policy justification, mere rationality of the facts underlying the decision and, again, a merely rational relationship between the classification and the policy justification." *AFSCME Iowa Council 61*, 928 N.W.2d at 32 (quoting *Varnum v. Brien*, 763 N.W.2d 862, 879 (Iowa 2009)); *cf. King v. State,* 818 N.W.2d 1, 27–28 (Iowa 2012) (holding that absent the deprivation of a fundamental right, we apply a rational basis test under which we "must determine whether the classification is 'rationally related to a legitimate governmental interest,' " and consider a "classification [to be] valid 'unless the relationship between the classification and the purpose behind it is so weak the classification must be viewed as arbitrary or capricious' " (quoting *Ames Rental Prop. Ass'n v. City of Ames,* 736 N.W.2d 255, 259 (Iowa 2007))).

*Turner*'s "exaggerated response" limitation precludes using a plausibility standard that allows a prison administrator's explanation—without supporting evidence—to satisfy traditional rational basis review. 482 U.S. at 87 (describing prior prison rights cases as asking "whether a prison regulation that burdens fundamental rights is 'reasonably related' to legitimate penological objectives, or

whether it represents an 'exaggerated response' to those concerns"). Thus, the *Turner* test requires more than the type of conclusory generalizations that might meet that traditional rational basis test. *See, e.g., Murphy v. Mo. Dep't of Corr.,* 372 F.3d 979, 986 (8th Cir. 2004) (holding that a prison's documented reason for censoring an item as "so racially inflammatory as to be reasonably likely to cause violence" was "too conclusory to support [summary] judgment in its favor" where the publication in question did "not appear to counsel violence" under the *Turner* test, "ask[ing] 'whether a ban on these particular items is reasonably related to a legitimate penological objective'" (second quoting *Williams v. Brimeyer,* 116 F.3d 351, 354 (8th Cir. 1997))). For example, one federal appellate court noted it had "previously held that a total ban on publications that espouse white supremacy is overly broad and does not *closely conform* to the purpose of upholding the security of the prison." *Id.* (citing *Murphy v. Mo. Dep't of Corr.,* 814 F.2d 1252, 1256 (8th Cir. 1987)). *Contrast Stefanow v. McFadden,* 103 F.3d 1466, 1473 (9th Cir. 1996) (holding that literature advocating racism and issuing a call to arms for white Christians was properly banned where prison officials reasonably concluded it was so inflammatory that it was reasonably likely to incite violence in the prison), *abrogated on other grounds by City of Boerne v. Flores,* 521 U.S. 507 (1997), *with McCabe v. Arave,* 827 F.2d 634, 637–38 (9th Cir. 1987) (holding that literature advocating racial purity but not advocating violence or illegal activity cannot constitutionally be banned).

*Turner* itself supports the view that actual evidence is required for the government to meet its burden to establish a legitimate basis for its restriction. In *Turner*, the Court relied on the following evidence from the record:

> Prison officials testified that mail between institutions can be used
> to communicate escape plans and to arrange assaults and other

> violent acts. Witnesses stated that the Missouri Division of Corrections had a growing problem with prison gangs, and that restricting communications among gang members, both by transferring gang members to different institutions and by restricting their correspondence, was an important element in combating this problem. Officials also testified that the use of Renz as a facility to provide protective custody for certain inmates could be compromised by permitting correspondence between inmates at Renz and inmates at other correctional institutions.

482 U.S. at 91 (citations omitted). In applying the standard, lower courts routinely rely on concrete evidence that supports a specific justification for a given regulation. *See, e.g., Moses v. Dennehy*, 523 F. Supp. 2d 57, 59 (D. Mass. 2007) (granting summary judgment for defendants in challenge to prison regulation "banning the receipt, possession, and display of nearly all materials containing nude or semi-nude images or sexually explicit content," which was enacted after the DOC conducted a review of inmate mail procedures that revealed that "[s]exually explicit materials played some role in several of the 275 compiled incident reports" of a sexual nature over a two-year period, from which the DOC concluded that sexually explicit materials in prison facilities were "detrimental to prison security and the Department's rehabilitative efforts, and that it promoted the sexual harassment of female prison guards"), *aff'd sub nom., Josselyn v. Dennehy*, 333 F. App'x 581, 584 (1st Cir. 2009) (per curiam) (explaining that "deference to the Commissioner's views was particularly appropriate because those views were . . . buttressed by concrete examples of how restricting prisoners' receipt of sexually explicit materials is related to prison safety and security"); *cf. Payton v. Cannon*, 806 F.3d 1109, 1110 (7th Cir. 2015) (Posner, J.) ("[W]e think it important to note for future reference that the ex-warden's statement, though plausible and thus sufficient for judgment given the absence of countervailing evidence, is not ironclad. Why the prison should be concerned if the prisoners swap these magazines is nowhere explained; nor is it

suggested that arguments over sharing would cause a nontrivial increase in violence and intimidation. And as for inmates masturbating in front of female staff, it seems on the one hand a practice that male inmates can be expected to engage in even if they have no access to nude photographs and on the other a matter calling for swift punishment of the offenders."). So, the State must present record evidence to meet *Turner*'s reasonableness standard to withstand the inmates' First Amendment challenge.

**C. Free Speech Challenge Under Article I, Section 7 of the Iowa Constitution.** The plaintiffs ask us to apply strict scrutiny to infringements of inmates' free speech rights protected by the Iowa Constitution or, if we are going to find a federal framework persuasive, they ask us to apply the standard from *Martinez. See* 416 U.S. at 413–14. As explained below, we reject those proposed standards under article I, section 7 of the Iowa Constitution.

The Iowa Constitution extends "the liberty of speech" to "[e]very person." Iowa Const. art. I, § 7. In full, it provides the following:

> Every person may speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech, or of the press. In all prosecutions or indictments for libel, the truth may be given in evidence to the jury, and if it appears to the jury that the matter charged as libellous was true, and was published with good motives and for justifiable ends, the party shall be acquitted.

*Id.*; *see also City of West Des Moines v. Engler*, 641 N.W.2d 803, 805 (Iowa 2002) (rejecting an argument that "the first sentence in section 7 operates entirely independently from the second sentence"). We agree with the plaintiffs that imprisonment does not strip personhood: "prisoners[] are persons, and they are not beyond the pale of the Constitution." *Fichtner v. Iowa State Penitentiary*, 285 N.W.2d 751, 756 (Iowa 1979) (en banc), *overruled on other grounds by Speller*

*v. State*, 534 N.W.2d 445, 452 (Iowa 1995). Incarcerated individuals retain the liberty of speech in the Iowa Constitution.

Outside the prison context, we have commonly analyzed article I, section 7 coextensively with the First Amendment. *See, e.g., State v. Geddes*, 998 N.W.2d 166, 175–79 (Iowa 2023); *State v. Aschbrenner*, 926 N.W.2d 240, 244, 254 (Iowa 2019); *Bierman v. Weier*, 826 N.W.2d 436, 451–52 (Iowa 2013); *In re Adoption of S.J.D.*, 641 N.W.2d 794, 802 (Iowa 2002); *State v. Milner*, 571 N.W.2d 7, 12 (Iowa 1997); *Iowans for Tax Relief v. Campaign Fin. Disclosure Comm'n*, 331 N.W.2d 862, 868 (Iowa 1983) (en banc); *Des Moines Reg. & Trib. Co. v. Osmundson*, 248 N.W.2d 493, 498 (Iowa 1976) (en banc). Indeed, the Iowa Constitution's liberty of speech provision "generally imposes the same restrictions on" state action as the First Amendment's freedom of speech clause. *Bierman*, 826 N.W.2d at 451 (quoting *Milner*, 571 N.W.2d at 12); *see also* Todd E. Pettys, *The Iowa State Constitution* 81 (2d ed. 2018) ("In the modern era, . . . the focus in Iowa's free-expression cases is squarely on the First Amendment."). Iowa is not unique in that regard: "the bills of rights of thirty-three other states contained language nearly identical to" our free speech guarantee, and "[a] substantial majority of the courts in those states have interpreted this free-speech language as being coextensive with that of the First Amendment to the federal constitution." *Engler*, 641 N.W.2d at 805.

Although we have often treated the reach of state and federal free speech rights as coextensive, we do not adopt federal precedent as our own under a lockstep approach. *E.g., State v. White*, 9 N.W.3d 1, 10 (Iowa 2024) ("We have emphasized that federal court opinions about the *Federal* Constitution do not dictate *our* interpretation of the Iowa Constitution."); *Varnum*, 763 N.W.2d at 878 n.6 ("[W]e find federal precedent instructive in interpreting the Iowa

Constitution, but we refuse to follow it blindly."). Even if we end up adopting a federal framework, we do so by applying our own analysis. *E.g.*, *State v. Lacey*, 465 N.W.2d 537, 539–40 (Iowa 1991) (considering whether free speech rights under article I, section 7 extended to picketing on private property, as some other states had held under their own constitutions, but concluding that the Iowa Constitution did not prohibit a private party from disallowing picketing on his private property). "We jealously guard our right to construe a provision of our state constitution differently than its federal counterpart . . . ." *State v. Brown*, 930 N.W.2d 840, 847 (Iowa 2019) (quoting *State v. Brooks*, 888 N.W.2d 406, 410 (Iowa 2016)).

Yet, this case is not one where we find it appropriate to disregard the well-established federal framework and chart a different path, as the plaintiffs would have us do by applying *Martinez*. And the plaintiffs' request that we apply strict scrutiny to their article I, section 7 claim ignores the fact of their imprisonment. *See, e.g.*, *Polk Cnty. Sheriff v. Iowa Dist. Ct.*, 594 N.W.2d 421, 429–30 (Iowa 1999) (en banc) (recognizing that federal "constitutional rights . . . are subject to restrictions and limitations justified by the considerations underlying the penal system"); *Risdal*, 573 N.W.2d at 263 (same); *Fox*, 493 N.W.2d at 831–32 (same).

Under the United States Constitution, "*Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights." *Washington v. Harper*, 494 U.S. 210, 224 (1990), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472, 483–84 (1995). The *Turner* framework is not limited to free speech, although it is most often applied in that context. *See Turner*, 482 U.S. at 91–99 (applying the same framework to free speech and right to marry); *see, e.g.*, *Overton v. Bazzetta*, 539 U.S. 126, 131–36 (2003) (applying

*Turner* to substantive due process and freedom of association); *Michenfelder v. Sumner*, 860 F.2d 328, 333–34 (9th Cir. 1988) (same for right to privacy); *Williams v. Lara*, 52 S.W.3d 171, 192–94 (Tex. 2001) (same for free exercise of religion). We find *Turner*'s "standard of review for prisoners' constitutional claims," 482 U.S. at 85, instructive in analyzing inmates' liberty of speech claims under article I, section 7 of the Iowa Constitution.

Other states facing similar challenges have adopted *Turner* under the free speech provision of their respective state constitutions. *See, e.g., Antenor v. Dep't of Corr.*, 462 P.3d 1, 17 (Alaska 2020); *Cacicio v. Sec'y of Pub. Safety*, 665 N.E.2d 85, 92 (Mass. 1996); *Pryor v. Dep't of Corr.*, 929 A.2d 1091, 1102–03 (N.J. Super. Ct. App. Div. 2007) (finding "no basis in New Jersey law to depart from . . . the *Turner* analysis" under a state constitutional provision that is virtually identical to article I, section 7 of the Iowa Constitution). The parties have not cited, nor have we found, any jurisdiction that outright rejected the *Turner* framework for inmates' challenges to similar free speech rights provided under their own constitution. *But see County of Nevada v. Super. Ct.*, 187 Cal. Rptr. 3d 27, 34 n.2 (Ct. App. 2015) (discussing a California Supreme Court decision that "was abrogated in 1994 by an amendment to [the California Penal Code] designed to conform California law to the decision in *Turner*"); *Rasheed v. Comm'r of Corr.*, 845 N.E.2d 296, 302 & n.2 (Mass. 2006) (recognizing that a state constitutional provision explicitly gives inmates more protection than *Turner* for religious exercise, even though Massachusetts follows *Turner* in other contexts such as free speech). We decline the plaintiffs' request for our state to become the first to do so. Inmates' liberty of speech is "subject to restrictions and limitations justified by the considerations underlying the penal system," *Polk Cnty. Sheriff,*

594 N.W.2d at 429–30, and thus properly analyzed under a *Turner*-type framework.

As previously noted, the First Amendment's free speech right includes not only the right to disseminate information (i.e., to speak, write, and publish), but also "the right to receive information and ideas." *Stanley*, 394 U.S. at 564. The Supreme Court has described that right as "fundamental to our free society." *Id.* The right to receive information exists "regardless of the[ information's] social worth," *id.*, to the point that "all agree" that adults "have a First Amendment right to access at least some" sexually explicit content, *see Free Speech Coal., Inc.*, 606 U.S. at 466. In that regard, we have held that article I, section 7 likewise includes not only the right to disseminate information but also the right to receive or access it. *See Aschbrenner*, 926 N.W.2d at 252 (strictly construing requirement for sex offender to report Internet identifiers to sheriff by limiting reporting requirement to "Internet identifiers used for *outgoing* communications or postings sent by the offender, consistent with the statute's purpose to guard against anonymous trolling for victims" in order to avoid "sweep[ing] in [Internet] accounts harmlessly used for the passive receipt of entertainment and information" against a free speech challenge under article I, section 7); *In re Adoption of S.J.D.*, 641 N.W.2d at 803 (balancing the right of an adopted adult to receive information about the identity of their biological parents against the parents' right to withhold that information).

The plaintiffs have shown that section 904.310A would be subject to strict scrutiny but for their imprisonment. The statute would be a content-based regulation if its implementing regulations, *see* Iowa Admin. Code rs. 201—20.2 to 20.6, did not tie the ban to correctional facilities' legitimate penological interests, *see Chiles*, 146 S. Ct. at 1021; *Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. at

69. The regulation would infringe their right to access sexually explicit materials. *See Free Speech Coal., Inc.*, 606 U.S. at 466; *Reno*, 521 U.S. at 874–75; *Stanley*, 394 U.S. at 564. It is sufficient to rely on these settled, paradigmatic First Amendment principles—particularly when we have never identified a separate standard for these issues under the Iowa Constitution—because we have long said that "the Iowa Constitution generally imposes the same restrictions on the regulation of speech as does the federal constitution." *Milner*, 571 N.W.2d at 12. Thus, the inmates have "made a prima facie claim of infringement of [their] freedom of speech, and the [State] must present some evidence to show that the restriction is justified by" a legitimate penological interest. *King v. Fed. Bureau of Prisons*, 415 F.3d 634, 639 (7th Cir. 2005) (Posner, J.).

Justice McDonald's opinion concurring in the judgment would have us hold that article I, section 7 of the Iowa Constitution is not implicated at all based on its original meaning. Not only do inmates lack any rights under article I, section 7 that need to be balanced against penological justifications to restrict their access to nude magazines, but apparently no Iowa citizen has the constitutional right to receive information of any type, period. But that cannot follow from the text of article I, section 7, which separately guarantees "the liberty . . . of the press." Iowa Const. art. I, § 7. The liberty of the press would mean little if it merely protected the right to publish but not the right to distribute or receive that which is published. *See Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) ("The right of freedom of speech and press has broad scope. The authors of the First Amendment knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance. This freedom embraces the right to distribute literature, and

necessarily protects the right to receive it." (citation and footnote omitted)); *see, e.g., King,* 415 F.3d at 638 (Posner, J.) ("Freedom of speech is not merely freedom to speak; it is also freedom to read. Forbid a person to read and you shut him out of the marketplace of ideas and opinions that it is the purpose of the free-speech clause to protect." (citations omitted)); *Conant v. Walters,* 309 F.3d 629, 643 (9th Cir. 2002) (Kozinski, J., concurring) ("It is well established that the right to hear—the right to receive information—is no less protected by the First Amendment than the right to speak. Indeed, the right to hear and the right to speak are flip sides of the same coin. As Justice Brennan put it pithily, 'It would be a barren marketplace of ideas that had only sellers and no buyers.' " (citations omitted) (quoting *Lamont v. Postmaster Gen.,* 381 U.S. 301, 308 (1965) (Brennan, J., concurring), *quoted with approval in Pico,* 457 U.S. at 867 (plurality opinion))). And such a position is inconsistent with both our long-settled view that article I, section 7 is generally coextensive in its reach with that of the First Amendment, *see Bierman,* 826 N.W.2d at 451; *Milner,* 571 N.W.2d at 12, and our recognition that article I, section 7 likewise covers the right to receive information, *see Aschbrenner,* 926 N.W.2d at 252 (recognizing that article I, section 7 extends to "the passive receipt of entertainment and information" from the internet); *In re Adoption of S.J.D.,* 641 N.W.2d at 803 (recognizing that both article I, section 7 and the First Amendment protect a general right to receive information).

A unanimous opinion applying *Turner* written by Justice Thomas made it abundantly clear that inmates' rights are not trapped in the nineteenth century:

> [F]or much of this country's history, the prevailing view was that a prisoner was a mere "slave of the State," who "not only forfeited his liberty, but all his personal rights except those which the law in its humanity accords him." In recent decades, however, this Court has determined that incarceration does not divest prisoners of all

> constitutional protections. Inmates retain, . . . as relevant here, certain protections of the First Amendment.

*Shaw v. Murphy*, 532 U.S. 223, 228–29 (2001) (quoting *Jones*, 433 U.S. at 139 (Marshall, J., dissenting)). We need not upend our article I, section 7 jurisprudence to decide this case, which would return us to the days that allowed a silence code in Iowa's prisons. *See* Joyce McKay, *Reforming Prisoners and Prisons: Iowa's State Prisons—The First Hundred Years*, 60 Annals of Iowa 139, 142 (2001). That is especially true where the State has not asked us to do so, instead expressly advocating that *Turner* should apply to an article I, section 7 analysis. *See, e.g.*, *State v. Goble*, 4 N.W.3d 700, 706 (Iowa 2024) (refusing to overrule longstanding precedent sua sponte when no party argued for such a change); *cf.* Amy Coney Barrett, *Originalism and Stare Decisis*, 92 Notre Dame L. Rev. 1921, 1931 (2017) ("Originalism does not obligate a justice to reconsider nonoriginalist precedent *sua sponte*, and if reversal would cause harm, a Justice would be foolhardy to go looking for trouble.").

We similarly have no reason to address the obscenity doctrine, as Justice McDonald does, because neither party argues that this case involves materials that are obscene. *See State v. Thompson*, 954 N.W.2d 402, 409 n.2 (Iowa 2021) (rejecting the dissent's views as "contrary to the adversarial process" because "[o]ur system 'is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief' " (second alteration in original) (second quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020))); *accord Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (per curiam) (discussing the party-presentation principle). Indeed, there would be no basis for it under current doctrine. *See Miller v. California*, 413 U.S. 15, 24–25 (1973) (establishing obscenity doctrine guidelines); *accord State v. Canal*, 773 N.W.2d 528, 531 (Iowa

2009) (applying *Miller v. California* without reference to any Iowa-specific constitutional standard under article I, section 7 and recognizing that the Supreme Court has "found that 'all nudity cannot be deemed obscene even as to minors'" (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975))); *State v. Wedelstedt*, 213 N.W.2d 652, 657 (Iowa 1973) (en banc) (holding that "State statutes designed to regulate obscene materials must be carefully limited" and that "[t]o pass constitutional muster the general guidelines of *Miller* must be followed" (first quoting *Miller*, 413 U.S. at 23–24)). We decline to go beyond the parties' arguments to set out a novel constitutional theory by placing load-bearing weight on a one-paragraph opinion from 1897—a case that has never been cited in any subsequent decision from our court until today—that neither involves a free speech claim nor expressly declares that all nude materials were considered obscene, but rather takes for granted that certain nude photos were obscene in the context of that case. *See State v. Doty*, 73 N.W. 352, 352 (Iowa 1897) (stating that "[i]t is clear, and not denied, that the pictures taken of the women when nude were obscene" without discussing what it was about the nude photos that brought them within the ambit of a statute prohibiting the sale of obscene or indecent materials). We instead analyze the parties' arguments under a *Turner*-type framework as herein adopted because the inmates have shown that their rights under article I, section 7 have been implicated.

In sum, we see no reason to now apply—as the plaintiffs request—a heightened level of scrutiny to inmates' free speech rights under article I, section 7. We have already applied the *Turner* factors in prior free speech challenges by inmates, though we were bound to follow the United States Supreme Court because those cases were brought only under the First Amendment. *E.g.*,

*Carter v. State*, 537 N.W.2d 715, 717 (Iowa 1995) (per curiam) (applying *Turner* to a First Amendment claim); *Bryson v. Iowa Dist. Ct.*, 515 N.W.2d 10, 11–12 (Iowa 1994) (per curiam) (same), *overruled on other grounds by James v. State*, 541 N.W.2d 864, 869 (Iowa 1995). This case marks our first opportunity to conduct that analysis under article I, section 7 of the Iowa Constitution.

**D. Applying *Turner*.** We review constitutional challenges de novo. *See State v. Middlekauff*, 974 N.W.2d 781, 791 (Iowa 2022). "Under a de novo review, 'we make an independent evaluation of the totality of the circumstances as shown by the entire record.'" *In re N.S.*, 13 N.W.3d 811, 820 (Iowa 2024) (quoting *In re A.M.*, 908 N.W.2d 280, 283 (Iowa Ct. App. 2018)). "But because the district court had the opportunity to observe the witnesses and evaluate their credibility firsthand, we give deference to its factual findings." *Id.* (quoting *In re A.M.*, 908 N.W.2d at 283).

The plaintiffs' appeal pursues only a facial challenge to section 904.310A's ban on nude material. Accordingly, they have a stringent burden. To facially invalidate a statute for violating free speech rights, a challenger must show that the regulation "inhibit[s] the exercise of [such] rights [because] the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *State v. Bower*, 725 N.W.2d 435, 443 (Iowa 2006) (quoting *State v. Musser*, 721 N.W.2d 734, 746 (Iowa 2006)); *accord Wettach v. Iowa Bd. of Dental Exam'rs*, 524 N.W.2d 168, 171 (Iowa 1994).

Neither the represented plaintiffs nor Hays has advanced more than a perfunctory argument that "the statute is unconstitutional as applied to a particular set of facts." *Bonilla v. Iowa Bd. of Parole*, 930 N.W.2d 751, 764 (Iowa 2019) (quoting *Honomichl v. Valley View Swine, LLC*, 914 N.W.2d 223, 231 (Iowa 2018), *overruled on other grounds by Garrison v. New Fashion Pork LLP*,

977 N.W.2d 67 (Iowa 2022)). To the extent that the plaintiffs identify any specific materials that were denied by the State, they use those materials generally as examples of ways in which the State's regulation burdens protected speech rather than as the basis for a particular constitutional violation. *See State v. Jackson*, 4 N.W.3d 298, 311 (Iowa 2024) ("A party forfeits an issue on appeal when the party fails to make more than a perfunctory argument in support of the issue.").

But, as explained above, the plaintiffs have shown that regulating materials featuring nudity would infringe free speech outside the context of imprisonment. So, we apply *Turner* to the plaintiffs' challenge. *See* 482 U.S. at 89–91.

The Supreme Court identified four relevant factors under *Turner*, although the first is a threshold question. *See Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) ("The first *Turner* 'factor' is more properly labeled an 'element' because it is not simply a consideration to be weighed but rather an essential requirement."), *abrogated on other grounds by Kravitz v. Purcell*, 87 F.4th 111, 119–22 (2d Cir. 2023). Our first task is answering the threshold question of "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective." *Thornburgh*, 490 U.S. at 414; *see also Wolf*, 297 F.3d at 307–08 (reversing a district court decision upholding a prison restriction on showing R-rated or NC-17-rated movies where the district court failed to address which of the government's three proffered interests was sufficiently connected to the ban). The State identified three objectives to support its regulations: rehabilitation, safety of inmates, and safety of staff.

We start with the State's claim that the regulations were justified by concerns over inmate and staff safety. The district court treated these justifications jointly and found that they supported the regulations. It relied on Dr. Tatman's testimony about studies showing a link between materials containing nudity and prison violence. The district court found those studies to be corroborated by Lamb's testimony about specific instances of inmate assaults and harassment of female staff over pornography. Yet, the district court specifically found Lamb's testimony less helpful because he defined pornography to exclude nudity that was not sexually explicit. And the challenge here involves material that contains only non-sexually explicit nudity. We also note that Lamb's testimony about witnessing inmate assaults and harassment of staff concerned events at prisons outside of Iowa. When asked specifically about material containing only nudity during the three years he worked in Iowa prisons, Lamb admitted that he "never had any issue . . . here with the nudity, just the pornography."

We agree with the district court's finding that the regulations were justified by safety—particularly staff safety—in light of the record evidence about staff harassment in Iowa prisons. The plaintiffs testified at trial that the legislation was enacted in retaliation for the $2 million verdict the State was ordered to pay Sink, a correctional officer in the Clinical Care Unit of the Iowa State Penitentiary (ISP) in Fort Madison. *Sink*, 2016 WL 5930337, at *1. During the questioning of one plaintiff, the district court agreed to "take judicial notice of whatever is in the Court of Appeals decision in the *Sink* case." When the ISP stopped showing R-rated movies, the inmates blamed Sink. *Id.* at *1–2. Inmates threatened to rape her. *Id.* One wrote "Sink several explicit notes describing sexual acts he would like to perform with her," claiming "to have ejaculated on one of the[] notes he

gave to Sink." *Id.* She had to subdue another inmate who was in his cell masturbating. *Id.* These facts corroborate the studies discussed by Dr. Tatman concerning staff harassment.

This evidence supports the district court's conclusion that staff safety justified the regulations. *See, e.g., Reynolds*, 25 F.4th at 85–86 (holding that "there was more than sufficient evidence in the record to support the district court's conclusion" that a DOC policy limiting access to pictorial sexually explicit materials was implemented to address problems with harassment of female correctional officers based on, inter alia, testimony that " 'gunning,' *i.e.*, masturbating in front of female staff, [was] a prevalent practice at DOC facilities").

There was also evidence specific to inmate safety. Lamb testified that he "never had any issue" with materials featuring nudity while he worked in Iowa prisons. But Dr. Tatman testified about studies linking nude material to prison violence generally, which was corroborated by Lamb's additional testimony about witnessing prison assaults and harassment of female staff in other prisons. The inmates testified that the materials were regularly traded like currency, making it difficult to keep the materials out of the hands of sex offenders housed throughout Iowa's prisons. *Cf. Bomgaars v. State*, 967 N.W.2d 41, 43 (Iowa 2021) (noting that there were approximately 1,600 male sex offenders in the Iowa prison system and that an offender would typically be transferred to the prison where treatment occurs only when he neared his tentative discharge date). In sum, we agree with the district court's conclusion that concerns about inmate and staff safety justified the regulations based on the evidence submitted at trial. Thus, the threshold *Turner* factor was satisfied here.

We believe that the remaining *Turner* factors are also supported by the record. The plaintiffs misstate the second factor to argue that the regulation outright bans "an entire area of protected speech." The second factor focuses on "whether 'there are alternative means of exercising the right that remain open to prison inmates.'" *Reynolds*, 25 F.4th at 92 (quoting *Turner*, 482 U.S. at 90); *see also Thornburgh*, 490 U.S. at 417 (stating that the right "must be viewed sensibly and expansively"). The ban is limited to publications containing sexually explicit or nude pictures; it does not apply to sexually explicit text or to movies or videos. *See* Iowa Code § 904.310A; Iowa Admin. Code rs. 201—20.2, 20.6(5)(*c*); *see also Reynolds*, 25 F.4th at 92 (concluding that the second *Turner* factor is satisfied where the regulation prohibited only pictures, permitting inmates to possess "various categories of *written* sexually explicit materials").

With respect to the third factor, the plaintiffs themselves testified to the proliferation of contraband and the sharing of materials among inmates, even using them as currency. "[T]he likelihood that such material will circulate within the prison raises the prospect of precisely the kind of 'ripple effect' with which the Court in *Turner* was concerned." *Thornburgh*, 490 U.S. at 418. Because there would be a ripple effect once the challenged materials entered Iowa's prisons and began to be traded like baseball cards, we are "deferential to the informed discretion of corrections officials" in preventing the materials from pervasively spreading through correctional facilities. *See Turner*, 482 U.S. at 90. The third *Turner* consideration supports the State's defense of the regulations.

Finally, while the inmates argue that the prior version of the regulation and its reading rooms provide an easy alternative to the more burdensome ban, that does not address the more than *de minimis* cost it would impose on correctional facilities or satisfy the requirement that the alternatives be "obvious,

easy alternatives." *Mauro v. Arpaio,* 188 F.3d 1054, 1062 (9th Cir. 1999) (en banc); *accord Turner,* 482 U.S. at 90–91. The fourth *Turner* factor supports the State's policy choice as reasonable. For instance, the State elicited testimony from Bowker about Iowa's prisons being "extremely short of staff." And correctional facilities would have to dedicate one or two staff members to escort an inmate to reading rooms, resulting in even fewer available staff members to monitor other inmates in the facility. According to Bowker, making that accommodation "pose[s] additional security concerns when [prisons] have to do additional escorts that might not be part of routine security procedures." Indeed, the State pointed to the already dangerous conditions in correctional facilities, citing the March 2021 murders of staff at the penitentiary where eight of the nine appellants are incarcerated. *See Montague v. Skinner,* 30 N.W.3d 213, 216 (Iowa 2026) ("This case arises out of the tragic events of March 23, 2021, at Anamosa State Penitentiary. Two inmates, Thomas Woodard and Michael Dutcher, armed with hammers and a grinder they had obtained from the prison's machine shop, entered the prison infirmary as part of an escape plan. There they beat to death Robert McFarland, a corrections officer, and Lorena Schulte, a nurse. Woodard and Dutcher did not succeed in getting out of the prison; they were both apprehended and convicted of first-degree murder. But the deaths of McFarland and Schulte sparked an outcry and several investigations.").

While we disagree with the district court's belief that no evidence was needed to justify the regulations' ban on material featuring nudity, we conclude that the record provides the requisite evidence to establish that the regulations do not violate the plaintiffs' free speech rights.

**E. Hays's Appeal.** Hays's separate pro se appeal raises constitutional arguments beyond free speech. He argues that the State violated his rights to

equal protection and substantive due process, his right against unreasonable search and seizure, and his right against cruel and unusual punishments as well as his unenumerated rights. We address each of those claims in turn.

1. *Equal protection and substantive due process.* The district court concluded: "Plaintiffs have not proved a violation of equal protection or substantive due process for the same reasons they have not proved a violation of the first amendment." We agree. Although Hays does not forfeit his fundamental right to free speech based on his status as an inmate, imprisonment necessarily lowers the level of scrutiny we apply when that right is burdened. *See Fox*, 493 N.W.2d at 831–32 (recognizing that "the dominant interest of a penal institution in maintaining security" and "the interest of society in the security of its jails" serve to "qualif[y] the constitutional rights of prisoners"). Hays's free speech right does not receive more protection under the equal protection or due process clauses than it does under article I, section 7. His claims thus fail for the same reasons discussed above.

2. *Search and seizure.* Next, Hays argues that "Defendants are illegally seizing the Plaintiffs property which was purchased by them." He claims, without elaboration, that the "broad and liberal spirit" of Iowans' article I, section 8 rights forms the basis of a constitutional violation. (Quoting *State v. Coleman*, 890 N.W.2d 284, 286 (Iowa 2017).) But the State points out that, like free speech, inmates' constitutional protection against unreasonable search and seizure is also circumscribed. *See, e.g., Fox*, 493 N.W.2d at 831–32 (allowing prison officials to monitor inmates' phone calls); *State v. Ruan*, 419 N.W.2d 734, 737 (Iowa Ct. App. 1987) (holding that a pretrial detainee has no reasonable expectation of privacy in nonprivileged mail); *State v. Van Hoff*, 371 N.W.2d 180, 182–83 (Iowa Ct. App. 1985) (holding that a jailed defendant has no reasonable

expectation of privacy in an item he asks officers to bring from his home to his cell).

Indeed, inmates have no legitimate expectation of privacy in their prison cells. *Fox*, 493 N.W.2d at 831 (citing *Hudson*, 468 U.S. at 530). So Hays's claim necessarily fails because his brief does not specify any unreasonable search or seizure beyond "numerous cell searches wherein the court documents filed in this case were sometimes seized or otherwise 'lost' and never returned." We affirm the district court's conclusion that Hays "made no showing how the statute and regulations violate constitutional provisions against search and seizure."

3. *Cruel and unusual punishment and unenumerated rights.* Hays also makes references to cruel and unusual punishment and the unenumerated rights clause in his brief, but he does not advance a substantive argument as to how those rights were violated. "A party forfeits an issue on appeal when the party fails to make more than a perfunctory argument in support of the issue." *Jackson*, 4 N.W.3d at 311. The district court granted the State's motion for summary judgment on those claims, holding that Hays waived and forfeited the issues. We affirm the district court and need not address those issues any further here.

**F. What We Are Not Deciding.** This case presents a facial challenge to a ban on "any commercially published information or material to an inmate when such information or material . . . features nudity." Iowa Code § 904.310A(1). Our decision therefore does not address anything about section 904.310A's ban on sexually explicit content or any as-applied challenges that may be brought in the future. We similarly do not address the inmates' challenge to whether television shows or movies were unconstitutionally restricted under the statute or its

implementing regulations because the district court did not address the issue, *see Plowman v. Fort Madison Cmty. Hosp.*, 896 N.W.2d 393, 413 (Iowa 2017) ("A supreme court is 'a court of review, not of first view.'" (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005))), and the text of the regulation is limited to "a pictorial depiction" that is contained in a publication purchased by the inmate or a third party, Iowa Admin. Code rs. 201—20.2, 20.6(2).

### III. Conclusion.

For the foregoing reasons, we affirm the district court's judgment.

### Affirmed.

All justices concur except McDonald, J., who files an opinion concurring in the judgment, and May, J., who files a separate opinion concurring in the judgment.

**McDonald, Justice (concurring in the judgment).**

Article I, section 7 of the Iowa Constitution provides: "Every person may speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech, or of the press." The plaintiffs claim that the state constitutional right to speak, write, and publish one's sentiments on all subjects includes the right of prisoners to receive commercial print publications that contain sexually explicit content or feature nudity. The plaintiffs further claim that Iowa Code section 904.310A (2019) and its implementing regulations abridge that right. I conclude that the statute and implementing regulations do not abridge any right and that the district court correctly denied the plaintiffs' challenge to the statute and regulations.

I write separately because I disagree with the majority's rationale in affirming the judgment of the district court with respect to the plaintiffs' state constitutional claim. In resolving that claim, the majority asks whether this court should depart from the United States Supreme Court's caselaw—specifically, the four-factor test announced in *Turner v. Safley*, 482 U.S. 78, 89–91 (1987)—and, finding no reason to depart, the majority adopts the Supreme Court's framework to resolve the plaintiffs' claim. This approach asks the wrong question. A claim arising under the Iowa Constitution must be decided pursuant to the law established by the Iowa Constitution. The right question in that analysis is not whether this court should depart from the caselaw of a separate sovereign but instead what law article I, section 7 itself established. *See* Hans A. Linde, *E Pluribus—Constitutional Theory and State Courts*, 18 Ga. L. Rev. 165, 179 (1984) [hereinafter Linde, *Constitutional Theory and State Courts*] ("The right

question is not whether a state's guarantee is the same as or broader than its federal counterpart as interpreted by the Supreme Court. The right question is what the state's guarantee means and how it applies to the case at hand.").

In asking the wrong question, the majority arrives at the wrong answer. I respectfully disagree with the majority's conclusion that the state constitutional right to speak, write, and publish encompasses a right of prisoners to force the state to expend funds so that the prisoners may receive commercial print publications containing sexually explicit content or nudity. The original law established by article I, section 7 of the Iowa Constitution does not include such a right.

I.

I begin with what I believe to be points of agreement with the majority: the first principles regarding the adjudication of state constitutional claims. The state constitution is "the supreme law of the state, and any law inconsistent therewith, shall be void." Iowa Const. art. XII, § 1. "The original, fundamental law of the constitution as ratified by the people remains the law until amended." *State v. Lindaman,* 30 N.W.3d 547, 559 (Iowa 2025). "[U]ntil amended, it is a holy covenant, which judges are not at liberty to emasculate by urging a species of statute of limitation." *Id.* (quoting *Hunter v. Colfax Consol. Coal Co.,* 154 N.W. 1037, 1047 (Iowa 1915)).

Judicial decisions that hold a law unconstitutional on grounds other than the original law of the constitution "ignore[] the effect of such decisions on perhaps the most fundamental individual liberty of our people—the right of each man to participate in the self-government of his society." *In re Winship,* 397 U.S. 358, 385 (1970) (Black, J., dissenting). To protect the right of all Iowans to participate in the project of self-government, the judicial power to declare a law

in violation of the state constitution is limited to the enforcement of the law established by the constitutional provision at the time the provision was adopted. *See Stewart v. Bd. of Supervisors*, 30 Iowa 9, 17 (1870). When a court disregards this rule and holds a legislative act unconstitutional through de facto amendment of the state constitution by judicial construction, or when a court creates artificial legal hurdles the legislature must clear to enact a law (for example, the creation of standardless multifactor tests to survive judicially created standards of scrutiny), the court itself infringes the constitutional right of the people to govern themselves. *See Winship*, 397 U.S. at 384–85 (Black, J., dissenting) (stating that courts cannot deny people the freedom to govern themselves "except when the decision of the people as stated in laws passed by their chosen representatives, conflicts with the express or necessarily implied commands of our Constitution"); *Rivas v. Brownell*, 18 N.W.3d 211, 228 (Iowa 2025) (McDonald, J., concurring in the judgment) (stating that article XII, section 1 "applies to 'any law'—whether originating in the legislative, executive, or judicial departments" and that "this court is obligated to adjudge the constitutionality of its own law . . . according to the same standard we adjudge the constitutionality of the laws of the other departments of the government."); *Stewart*, 30 Iowa at 17 (stating that "the people, in their sovereign capacity," have the right to govern without judicial interference (quoting *Bennett v. Boggs*, 3 F. Cas. 221, 227 (C.C.D.N.J. 1830) (No. 1,319)).

It is for this reason that the rule of stare decisis must give way in constitutional cases; the rule of stare decisis cannot confer on this court by blind adherence to past opinions the authority to continue to violate the constitutional right of the people to govern themselves. The only constitutionally legitimate and lawful task of this court in adjudicating constitutional rights cases is to

determine and apply the law of the state constitution, as established at the time of its adoption, to enforce boundaries of permissible government action as set by the people themselves in the constitution. *See Lindaman*, 30 N.W.3d at 559 (explaining that all government officials are bound by the "original law" of the state constitution); 1 *The Debates of the Constitutional Convention of the State of Iowa* 6–7 (W. Blair Lord rep., 1857) ("The constitution of a State may be regarded, to a certain extent, as a fixed and permanent instrument, a higher law, for the guidance, not only of individual members of the body politic, but also a law to which the various departments of the government, in their action, must conform."); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 180 (1803) ("Thus, the particular phraseology of the constitution of the United States confirms and strengthens the principle, supposed to be essential to all written constitutions, that a law repugnant to the constitution is void; and that courts, as well as other departments, are bound by that instrument."); *The Federalist No. 78*, at 404 (Alexander Hamilton) (George W. Carey & James McClellan eds., Gideon ed. 2001) ("Nor does this conclusion by any means suppose a superiority of the judicial to the legislative power. It only supposes that the power of the people is superior to both; and that where the will of the legislature declared in its statutes, stands in opposition to that of the people declared in the constitution, the judges ought to be governed by the latter, rather than the former. They ought to regulate their decisions by the fundamental laws, rather than by those which are not fundamental.").

This court determines the original law of the state constitution by examining the text of the constitution in light of the law, customs, and practices in place at the time the constitutional provision was adopted. *See Hunter*, 154 N.W. at 1047; *see also Lennette v. State*, 975 N.W.2d 380, 403–04 (Iowa

2022) (McDonald, J., concurring). We look at the legal context in which the state constitutional provision was adopted because the constitution "is not the beginning of a community, nor the origin of private rights; it is not the fountain of law, nor the incipient state of government; it is not the cause, but consequence, of personal and political freedom." *Hanson v. Vernon*, 27 Iowa 28, 74 (1869) (quoting Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 37 (1868)), *overruled on other grounds by Bonnifield v. Bidwell*, 32 Iowa 149, 150 (1871). The state constitution is "necessarily based upon pre-existing condition of laws, rights, habits and modes of thought" of the people "derived from a known source." *Id.* (quoting Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 37 (1868)).

It must be admitted that in some cases it is more difficult than others to determine the original law created by the state constitution. The state constitution is almost one hundred and seventy years old. The legal contexts and doctrines that gave some of its provisions meaning and operational effect have been rejected or changed over time. In addition, some of its provisions and terms are vague, others ambiguous, others open-textured, and yet others ill-defined.

These interpretive difficulties, however real, do not create an impediment to adjudicating cases because this court's long-standing rules of constitutional adjudication resolve the issue. Under this court's rules of adjudication, statutes are presumed to be constitutional, and this court "will not declare statutes unconstitutional 'unless they are shown to clearly, palpably and without doubt' " violate the constitution. *Olsen v. State*, 9 N.W.3d 21, 29 (Iowa 2024) (quoting *Chi. Title Ins. v. Huff*, 256 N.W.2d 17, 25 (Iowa 1977) (en banc)); *see also State v.*

*Porter*, 33 N.W.3d 281, 294 (Iowa 2026) (declining to hold police officer's conduct unconstitutional absent a showing it was "clearly and palpably in violation of the state constitution"); *Garrison v. New Fashion Pork LLP*, 977 N.W.2d 67, 85 (Iowa 2022) ("Thus, it seems clear by logical deduction, and upon the most abundant authority, that this court has no authority to annul an act of the legislature unless it is found to be in clear, palpable and direct conflict with the written constitution." (quoting *Stewart*, 30 Iowa at 18–19)); *Town of McGregor v. Baylies*, 19 Iowa 43, 49 (1865) ("Where the constitutional[i]ty of an act of the Legislature is doubtful merely, it is our duty to sustain and enforce it; but where the conflict is clear and palpable, it is equally our duty to declare such act null and void, and to maintain inviolate the paramount fundamental law, which has received the more solemn approval of the people as the palladium of their rights."); Under these rules of adjudication, courts do not need to be able to determine the exact nature and scope of every constitutional provision to resolve cases; they only need to know enough to determine whether a challenged law is clearly and palpably in violation of the state constitution. When the nature and scope of a constitutional provision is not clear, when the law runs out, courts are required to reject the constitutional challenge to the law and affirm the will of the people as expressed in the law being challenged.

## II.

Now to points of disagreement. I part company with the majority, first, on its methodology. In resolving a state constitutional claim, asking whether this court should depart from the Supreme Court's caselaw is the wrong question. The right question is what law the state constitution itself established. *See* Linde, *Constitutional Theory and State Courts*, 18 Ga. L. Rev. at 179.

In determining what law the state constitution established, this court has an obligation to make that determination independent of the Supreme Court's jurisprudence with respect to similar provisions of the Federal Constitution. *See State v. White*, 9 N.W.3d 1, 10–11 (Iowa 2024). This court has "emphasized that federal court opinions about the Federal Constitution do not dictate our interpretation of the Iowa Constitution." *Id.* at 10 (collecting cases). The Supreme Court's federal constitutional jurisprudence is not a framework that dictates the nature and scope of the state constitution or a floor that dictates the minimum constitutional protections the state constitution must provide. "[T]he level of protection of rights under the state constitutions can be the same as, higher than, or lower than that provided by the federal constitution." *Malyon v. Pierce County*, 935 P.2d 1272, 1281 n.30 (Wash. 1997) (en banc) (quoting Neil McCabe, *The State and Federal Religion Clauses: Differences of Degree and Kind*, 5 St. Thomas L. Rev. 49, 50 (1992)).

The majority does not fulfill its obligation to independently determine state constitutional law in this area. Instead, the majority adopts wholesale the Supreme Court's caselaw in this area based on this court's prior statements that article I, section 7 "generally imposes the same restrictions on the regulation of speech as does the federal constitution." *Bierman v. Weier*, 826 N.W.2d 436, 451–52 (Iowa 2013) (quoting *State v. Milner*, 571 N.W.2d 7, 12 (Iowa 1997)); *see also In re Adoption of S.J.D.*, 641 N.W.2d 794, 802 (Iowa 2002); *Iowans for Tax Relief v. Campaign Fin. Disclosure Comm'n*, 331 N.W.2d 862, 868 (Iowa 1983) (en banc); *Des Moines Reg. & Trib. Co. v. Osmundson*, 248 N.W.2d 493, 498 (Iowa 1976) (en banc). These statements do not support the majority's approach in this case, however.

It is true that the original law established by the First Amendment was largely the same as the original law established by article I, section 7: each was a limited right that secured the freedom of speech and the press from prior restraint. *Cf.* Joseph Story, *Commentaries on the Constitution of the United States* § 1874 (1833) ("It is plain, then, that the language of this amendment imports no more, than that every man shall have a right to speak, write, and print his opinions upon any subject whatsoever, without any prior restraint, so always, that he does not injure any other person in his rights, person, property, or reputation . . . ."); Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 417 (1871) (same) [hereinafter Cooley, *A Treatise on the Constitutional Limitations*].

It is also true, however, that the Supreme Court's First Amendment jurisprudence has strayed far from the original law established by the First Amendment.

> [T]he First Amendment . . . [did not] elevate speech to a constitutionally privileged liberty interest to be defended by free-ranging judicial supervision. Founding Era judges, after all, were confined to defending "marked and settled boundaries" of governmental authority, disregarding legislation only where constitutional violations were clear. Judges could not apply jurisprudential concepts "regulated by no fixed standard" on which "the ablest and the purest men have differed," even when those principles were enumerated in a written Constitution. Judicial applications of the First Amendment were therefore limited to enforcing customary legal principles, even though the *concept* of expressive freedom, as a natural right, had a far broader range of potential implications.

Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L.J. 246, 311–12 (2017) (citations omitted) (quoting *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 399 (1798) (Iredell, J., concurring)).

> [The Supreme Court's] modern doctrine inverts the Founding Era understanding of freedom of speech as a natural right by putting the

> onus on the government to demonstrate a compelling justification for speech restrictions and by making judges the arbiters of what interests are compelling. Historically, it was up to legislators to assess which restrictions of speech would best serve the common good, with very little room for judicial oversight.

*Id.* at 316.

The divergence between the Supreme Court's precedents and the original law established by the federal and state constitutions is legally significant. This court only has the authority to declare a law unconstitutional when it clearly and palpably conflicts with the original law established by the state constitution. *See Lindaman,* 30 N.W.3d at 559 ("More specifically, 'This Constitution,' i.e., the state constitution as adopted in 1857, is 'the supreme law of the state, and any law inconsistent therewith, shall be void.' " (quoting Iowa Const. art. XII, § 1)); *Olsen,* 9 N.W.3d at 29. This court cannot supplant the law established by the state constitution with the caselaw from a separate sovereign. If the Supreme Court's precedents do not accurately reflect Iowa constitutional law, they have no more bearing on any question of Iowa constitutional law than the caselaw of Alaska, Texas, or Mozambique. If the two provisions shared the same original meaning, and I do not contest that they did, and the Supreme Court has departed from that meaning, then following the Supreme Court's precedents departs from the original law of both constitutions. That the rights under the federal and state constitutions were originally coextensive is thus a reason to apply the original law of the state constitution independently and not a reason to adopt the Supreme Court's doctrinal innovations wholesale.

### III.

The majority's decision to adopt the Supreme Court's jurisprudence leads it astray. I respectfully disagree with the majority's conclusion that article I, section 7 of the Iowa Constitution includes the right of prisoners to force the

state to expend funds so that the prisoners may receive commercial print publications containing sexually explicit content or depictions of nudity. That right finds no support in the original law of the Iowa Constitution. The text, history, and pre-existing law are all to the contrary.

The text of the state constitution does not support the conclusion that there is a state constitutional right to receive information. The constitution protects the right to "speak, write, and publish [one's] sentiments on all subjects." Iowa Const. art. I, § 7. These are all active, expressive verbs. They protect the right of the individual to express or communicate one's own sentiments. None of these verbs encompasses, by its ordinary meaning, a passive right to receive or possess materials created by others. It might be urged that the right to publish is inherently relational and thus implies an audience with a correlative right to receive, but article I, section 7 protects the act of publishing, not the act of receiving. The constitutional protection attaches to the publisher's freedom from prior restraint and censorship, and even then, it does not prohibit punishment for abuse of that right. Whatever rights the constitution affords a publisher, it does not create an enforceable right in the audience to obtain whatever the publisher disseminates. Further, it certainly does not protect a right for prisoners to require the state government to expend its funds to help them obtain specific publications, which is what Iowa Code section 904.310A actually prohibits.

The leading contemporary treatise confirms this reading. Judge Cooley's treatise on state constitutional law explained that every state constitution, including Iowa's, had a provision protecting the right to free speech. *See* Cooley, *A Treatise on the Constitutional Limitations* at 414. These state constitutional protections for the freedom of speech and freedom of the press did "not assume

to create new rights" but instead were intended "to protect the citizen in the enjoyment of those already possessed." *Id.* at 416. Judges had to "turn[] back from these provisions to the pre-existing law, in order that [they] may ascertain what the rights are which are thus protected, and what is the extent of the privileges they undertake to assure." *Id.* at 416–17. In reviewing the law at the time, Cooley concluded that these state constitutional provisions were limited, and they merely protected the right to be free from prior restraint and censorship. *See id.*

Even assuming there is a state constitutional right to receive information, an examination of the pre-existing law at the time the state constitution was adopted makes clear that the right does not include a right to receive commercial print materials of a sexually explicit nature or portraying nudity. At the time the state constitution was adopted, printed materials containing sexually explicit content or portraying nudity were deemed contraband subject to forfeiture. *See Goddard v. President & Trs. of Town of Jacksonville*, 15 Ill. 588, 594 (1854) (stating that "obscene books, prints and pictures" may be banned pursuant to the police power); *Beebe v. State*, 6 Ind. 501, 546–47 (1855) (per curiam) ("Gambling apparatus, obscene books, &c., are subjects of traffic, . . . and yet the manufacture of and commerce in them have been outlawed. No copyright can exist, consistently with principles of public policy, in any work of a clearly irreligious, immoral, libelous, or obscene description. It may be stated as a general principle, clearly deduced from an unbroken current of authorities, that property which has become a nuisance is placed beyond the pale of the law's protection . . . ." (citations omitted)), *overruled on other grounds by Schmitt v. F. W. Cook Brewing Co.*, 120 N.E. 19, 21 (Ind. 1918); *Lord v. Chadbourne*, 42 Me. 429, 432–33 (1856) ("[O]bscene prints . . . are immoral in and of themselves. It

is a crime to make, issue . . . or to keep for an instant immoral publications. The moral sense of the community, no less than the law itself, declares their outlawry at once. It cannot be right, or lawful, to make, issue, or retain them, even for an instant, except for the purpose of bringing offenders to justice."); *Preston v. Drew*, 33 Me. 558, 561–62 (1852) ("Obscene publications and prints are in their very nature corrupting, and productive only of evil. They are incapable of any use which is not corrupting and injurious to the moral sense."); *Commonwealth v. Kneeland*, 37 Mass. (20 Pick.) 206, 229–30 (1838) (Morton, J., dissenting) (explaining that freedom of speech relates to prior restraints, that obscenity may be prohibited and punished, and that "extravagant claims" to the contrary "greatly tend to endanger this right, which is so truly valuable, and which is regarded with so much favor by the constitution"); *State v. Brown*, 27 Vt. 619, 620–21 (1855) (discussing prosecution for distributing obscene materials); *Lincoln v. Smith*, 27 Vt. 328, 343 (1855) ("Nuisances may be abated in the most summary manner; . . . lottery tickets and obscene prints may be prohibited . . . .").

Iowa law was in accord with the general law. The Code of 1851 made it a crime for any person to "import, print, publish, sell, or distribute any book, pamphlet, ballad, or any printed paper containing . . . obscene prints, pictures or descriptions." Iowa Code § 2717 (1851). At that time, obscene printed material included depictions of nudity. *See State v. Doty*, 73 N.W. 352, 352 (Iowa 1897). This prohibition continued long after the adoption of article I, section 7. *See* Iowa Rev. § 4359 (1860); Iowa Code § 4022 (1873); Iowa Code § 4951 (1897); Iowa Code Supp. § 4952 (1913). Later versions of the Code extended the prohibition to the display of obscene materials. For example, it was against the law to display obscene materials inside bars. *See* Iowa Code § 2448(7) (1897);

Iowa Code Supp. § 2448(7) (1913). And a later piece of legislation required that employers of a certain size provide adequate water closets for their employees and required such water closets to be "free from all obscene writing or marking." Iowa Code Supp. § 4999-a1 (1913).

This court's precedents from the relevant time period also show that the right to free speech did not include the right to make, sell, or possess materials containing sexually explicit content, including nudity. In accord with the general law, such items were contraband subject to forfeiture under Iowa law. *See Santo v. State*, 2 Iowa (Clarke) 165, 216 (1855) (explaining that "[t]he laws of the states generally" allowed for the seizure "of obscene books, prints and pictures" as contraband and that such seizures had "never been objected to, on constitutional grounds, although they have existed from the beginning of these governments"); *Our House, No. 2 v. State*, 4 Greene 172, 174 (Iowa 1853) ("Under our federal, as well as under state constitutions, it is not uncommon to pass laws declaring articles to be forfeited, when they are used for illegal or criminal purposes. This is the case under the laws prohibiting counterfeiting, smuggling and piracy. So also with obscene books and pictures.").

The state prosecuted people for violating these laws. *See Doty*, 73 N.W. at 352. As indicated above, the Code made it unlawful to "sell[], or offer[] for sale or give[] away . . . any obscene, lewd, indecent, or lascivious books, pamphlets, paper drawing, lithograph, engraving, picture, photograph, model, cast, or any instrument or article of indecent or immoral[] use." *Id.* (omission in original) (quoting 1888 Iowa Acts ch. 177, § 1, codified at Iowa Code § 5335 (McClain ed. 1888)). Two women came to the defendant and "told him they had a bet with a man, whom they named, to the effect that they dared to have pictures taken of themselves when nude." *Id.* at 353. They requested the defendant take their

pictures in the nude, which he did, charging them twenty-five cents for each picture. *Id.* at 352. The defendant was convicted for violating the statute, and we affirmed his conviction, explaining that the fact the "women desired and bargained for the obscene pictures" made no difference. *Id.*

Given that the law at the time the Iowa Constitution was adopted deemed print materials containing sexually explicit content, including nudity, to be contraband and subject to forfeiture, I cannot conclude that the state constitution protects the right to receive such information. Further, given that these materials were prohibited to the public, it follows *a fortiori* that prisoners had no greater right to receive these materials. Indeed, at the time of Iowa's founding, no legal authority of which I am aware recognized that the freedom of speech applied to prisoners. Cooley's treatise, the leading contemporary authority on state constitutional limitations, does not discuss the application of free speech protections to the incarcerated. Nor do any reported decisions from the relevant period address the question. The silence of the contemporary legal authorities on this point is itself significant. The idea that prisoners retained a constitutional right to receive publications containing sexually explicit content or nudity was simply not part of the legal understanding at the time article I, section 7 was adopted.

For these reasons, I would hold that article I, section 7 does not confer upon prisoners a right to force the state to expend funds so that they can receive commercial print materials containing sexually explicit content or nudity. In the main, constitutionally enumerated rights are merely codifications of law, customs, practice, and shared understandings at the time of adoption. The constitutionalization of existing law is the people's way of preventing the government from backsliding and abrogating the rights they possessed at the

time of constitutional codification. If the people wish to expand individual rights, they can do so by creating statutory rights or by amending the state constitution. The legitimate expansion of constitutional rights and corresponding limits on government action cannot be accomplished by judicial decree. As this court explained more than one hundred and fifty years ago:

> The remedy for unwise or oppressive legislation, within constitutional bounds, is by appeal to the justice and patriotism of the representatives of the people. If this fail[s], the people, in their sovereign capacity, can correct the evil; but the courts cannot assume their rights. There is no *paramount* and *supreme* law which defines the law of nature, or settles those great principles of legislation which are said to control State legislatures in the exercise of the powers conferred on them by the people in the constitution.

*Stewart*, 30 Iowa at 17 (quoting *Bennett*, 3 F. Cas. at 227).

## IV.

Iowa Code section 904.310A and its implementing regulations do not clearly and palpably violate article I, section 7 of the Iowa Constitution. Nor do they violate the First and Fourteenth Amendments to the Federal Constitution. I concur in the court's judgment.

**May, Justice (concurring in the judgment).**

The court is right to affirm the district court's dismissal of the inmate-plaintiffs' challenge to Iowa Code section 904.310A (2019) and the related regulations, which prohibit prison inmates from obtaining commercial publications with pictures that are sexually explicit or feature nudity.

I write separately to mention two things. First, I agree with Justice McDonald that article I, section 7 of the Iowa Constitution is properly interpreted by reference to its text and history. And that text and history do not suggest that the meaning of article I, section 7 is tied to the federal courts' interpretations of the First Amendment to the Federal Constitution. In any event, that text and history offer no support for the plaintiffs' challenge.

Second, assuming arguendo that *Turner v. Safley*, 482 U.S. 78 (1987), governs the plaintiffs' article I, section 7 challenge, I would adopt the trial judge's analysis, including his conclusion that rehabilitation provided a sufficient justification for section 904.310A and the related regulations.

I appreciate all of my colleagues' efforts on this interesting case. I respectfully concur in the judgment.